790 So.2d 903 (2001)
Susan Joyce DAILEY, Appellant
v.
METHODIST MEDICAL CENTER, Dr. Martin Newcomb, Sarah Green, Renida Dee and Darlene Burt, Appellees.
No. 2000-CA-00259-COA.
Court of Appeals of Mississippi.
July 24, 2001.
*905 Edward P. Lobrano Jr., Attorney for Appellant.
Jim Bullock, Dallas, TX, James T. McColgan III, Memphis, TN, Michael Verdier Cory Jr., Lanny R. Pace, Jackson, Attorneys for Appellees.
Before McMILLIN, C.J., PAYNE, and LEE, JJ.
PAYNE, J., for the Court:

PROCEDURAL HISTORY
¶ 1. This is a case bringing several claims against the defendants, stemming from incidents which occurred while Ron Dailey was a patient at Methodist Medical Center. The defendants ultimately made motions for summary judgment, which were granted. Susan Dailey now appeals from the summary judgments. Finding that this case is not appropriate for summary judgment, we reverse and remand for trial on the merits. We affirm on the cross-appeal.
¶ 2. To better understand the procedural aspects of this case, a time-line of pertinent filings and deadlines follows:
DATE FILED
OR *DEADLINE DOCUMENT OR EVENT
12/19/97 - Complaint Filed by Dailey
02/13/98 - Service of Interrogatories to Dailey, Request for Production of Documents
 filed by Newcomb
*906
05/11/98 - Service of Plaintiff's Answer to Methodist's Interrogatories (Which
 includes content of expected expert testimony)
03/09/99 - Scheduling Order Filed
04/30/99 - *Deadline for Designation of Plaintiffs Experts
05/03/99 - Designation of Experts Filed by Plaintiff (Signed on 4/30/99).
05/24/99 - Designation of Experts by Green and Newcomb
05/25/99 - Motion for Summary Judgment by Newcomb
05/31/99 - *Deadline for Designation of Defendants' Experts (Plus 30 days for
 Green)
07/15/99 - *Deadline for Completion of Discovery (Plus 30 days for Green)
07/19/99 - Designation of Experts and Disclosure of Expected Testimony by
 Methodist, Dee and Burk
08/15/99 - *Deadline for Service of All Motions other than Evidentiary and In
 Limine
08/25/99 - Motion for Summary Judgment by Methodist Defendants
 - Itemization of Facts
 - Memo in Support of Motion
08/30/99 - Motion for Summary Judgment by Green
10/07/99 - Response by Plaintiff to Methodist Defendants' Itemization of Facts
 - Response to Methodist Defendants' Motion for Summary Judgment
 - Documents Submitted in Opposition to motion
10/15/99 - Reply to Response by Methodist Defendants
 - Plaintiff's Documents and Supplemental Documents in Response to
 Newcomb's and Methodist's Motions for Summary Judgment (Including
 Blackston's Affidavit and Hume's Supplemental Affidavit)
01/18/00 - Order granting Methodist's, Dee's and Burk's Motions for Summary
 Judgment
01/19/00 - Opinion and Order granting Newcomb's Motion for Summary Judgment
 and Dismissal
 - Order granting Green's Motion for Summary Judgment and Dismissal
 - Dismissal as to Methodist, Dee and Burk
02/15/00 - Notice of Appeal

STANDARD OF REVIEW
¶ 3. An appeal from summary judgment is reviewed de novo. Cossitt v. Alfa Ins. Corp. 726 So.2d 132, 136 (¶ 19) (Miss.1998). Therefore, the question is whether the appellant is entitled to relief as a matter of law. An overview of the law concerning a trial court's grant of summary judgment follows:
The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the *907 trial court under Rule 56(c). This Court conducts de novo review of orders granting or denying summary judgment and looks at all the evidentiary matters before itadmissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. The burden of showing that no genuine issue of material fact exists lies with the moving party, and we give the benefit of every reasonable doubt to the party against whom summary judgment is sought. We do not try issues. Rather, we only determine whether there are issues to be tried. Furthermore, it is well-settled that motions for summary judgment are to be viewed with a skeptical eye, and if a trial court should err, it is better to err on the side of denying the motion. The focal point of our de novo review is on material facts. In defining a "material" fact in the context of summary judgments, the Mississippi Supreme Court has stated that "[t]he presence of fact issues in the record does not per se entitle a party to avoid summary judgment. The court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense." Roebuck v. McDade, 760 So.2d 12 (¶ 9) (Miss.Ct. App.1999) (citations omitted).
Evans v. Jackson Coca-Cola Bottling Co., 771 So.2d 1006, 1008 (Miss.Ct.App.2000). "All that is required of a nonmoving party to survive a motion for summary judgment is to establish a genuine issue of material fact by the means available under ... Miss. R. Civ. P. 56(c)." Spartan Foods Systems, Inc. v. American Nat'l Ins. Co., 582 So.2d 399, 402 (Miss.1991) (citations omitted).

TIME LINE OF EVENTS
¶ 4. The following time line contains the events alleged, as gleaned from the complaint, defendant's answers to the complaint, depositions of defendants, deposition of Dr. Arthur Hume, exhibits attached to pleadings, disclosures of expected expert testimony, affidavits, answers to interrogatories and other documents before this Court:
December 27, 1995:
 Ron was admitted to Methodist Medical Center to build up fluid levels and reduce blood sugar count.
 A sodium chloride drip was installed with orders for an initial setting of 200 ml/hour for the first five hours, then to be reduced to 150 ml/hour until the next day.
December 28, 1995:
 The drip was supposed to be reduced to 50 ml/hour, but was not reduced.
 During the night, Ron had chills and a fever. Susan went to a nurse but was advised that the hospital had no blankets. Susan was told to get two sheets out of the linen closet. Susan finally had to get linens from a vacant bed.
 Despite Ron's elevated fever, a nurse did not come to check on him. Susan attempted to call the nurses station several times, but no one answered. Susan went to the nurse's station and learned that no one was on duty on the floor.
December 29, 1995:
 a.m.Ron had a radiation treatment
 1:15 p.m.Susan went home to get needed items. Before leaving, she talked to the nurses about leaving a note for Ron. She left his door open so one could see down the hall.

*908  Ron attempted to get to the bathroom, but fell and severely injured his kneecaps. He could not get up. His IV was partially pulled out and leaking. He could not rouse any assistance and no one came to check on him.
 About 1-½ hours later, Ron's sister came to visit and found Ron on the floor.
 Nothing was done for the pain in his knee caps and he was not otherwise treated for the fall.
 Ron was never able to walk again and was completely bedridden thereafter.
December 31, 1995:
 At approximately 2:00 a.m., defendant nurse, Sarah Green, erroneously installed Pitocin (Oxytocina labor inducing drug which stimulates contractions) into Ron's IV.
 The Pitocin was administered at 150 ml/hour, far in excess of properly administered dosage of Pitocin, even though the ordered rate for the correct medication (sodium chloride) was only 50 ml/hour. Standard precautionary literature for Pitocin advises that it can result in water retention and induce water intoxication, which allegedly occurred in Ron.
 The dosage of Pitocin allegedly exacerbated the effects of a sepsis condition with which Ron was infected while in the hospital.
 Between 3:00 and 4:00 a.m., Ron was gasping for breath and becoming increasingly swollen. Susan was frightened for him.
 At approximately 7:30 to 8:00 a.m., Susan went to the nurse's station and advised the desk clerk that she felt Ron was dying.
 At 8:05 a.m., defendant nurse, Renida Dee, made an entry on Ron's notes that she lowered the drip rate to 50 ml/hour. She made no notation that Pitocin was being administered rather than sodium chloride.
 This was a false entry by Dee, regardless, because when the error was finally discovered, it was still being administered at 150 ml/hour.
 Around 8:45 a.m., Dr. Thigpen's "opinion," which is actually the defendant's disclosure of expected testimony, stated that on the 31st, "Ron was somewhat short of breath in the morning and complained of discomfort and was given IV Lasix. He complained of abdominal fullness and distention." In other words, Ron was given Lasix to combat the swelling now alleged to have been caused by the Pitocin, yet even when the Lasix was added to his IV, the nurse still did not notice that Ron was being given the wrong drug. The disclosure states that "it was noted at that point on the 31st that he had been erroneously placed on Pitocin ...", making it sound as if it was discovered at the time the Lasix was given, but it was not.
 Approximately 11:00 a.m., Dr. Newcomb came into the room, but did not discover the erroneous medication being administered at a higher rate than was prescribed for the sodium chloride. He had prescribed morphine earlier and now prescribed Dilaudid.
 At 11:45 a.m., Ron's face was red although the rest of his body was white. His breathing was labored and he was having difficulty breathing at all. His ankles were swollen to almost the size of basketballs. *909 The disclosure of expected testimony of Dr. Thigpen claims that when the Pitocin was discovered, Ron was initially fairly comfortable, but became increasingly uncomfortable with tachypnea and hypotension on the evening of the 31st.
 At 12:50 p.m., Ron's stepdaughter, Michelle Bowman, discovered that the name "Tracy Henderson," and a room number different than Ron's, was on the IV bag. The label clearly reflects "lactated ringers" and "Pitocin," and "1,000 cc." There was 87 cc's remaining in the bag.
 Susan and Michelle went to the nurse's station and advised the desk clerk that Ron was being administered the wrong medication.
 The desk clerk came into the room and said, "that is what he's taking."
 Defendant nurse, Darlene Burt, came in the room and assured them that the medication was "harmless".
 Burt replaced the Pitocin with sodium chloride. She allegedly placed the Pitocin bag in her pocket instead of in the trash can as other empty bags had been placed.
 Burt gave excuses such as "being short of assistance" and "having to borrow a drip from the floor."
 Burt left the room, then returned and made an excuse that sometimes there are two labels and someone just did not get the right label on the bag, and suggested that the pharmacist may have put the wrong label on the bag.
 The desk clerk called Burt on the intercom and, not realizing the speaker was on, advised her to tell the Daileys that it was the right medication, but that the pharmacist put the wrong label on it. This was overheard by Ron, Susan, Michelle, and Ron's brother.
 At approximately 1:30 p.m., Susan and Michelle reported the matter to a supervisory nurse.
 At approximately 2:40 p.m., the supervisory nurse and Burt came to Ron's room. Burt was allegedly crying. Burt admits that she said she was sorry that he had been given Pitocin.
 At approximately 4:00 p.m., the supervisory nurse returned and advised that she had called Dr. Newcomb. He had asked her if the family knew about the wrong medication, and responded, "Oh, hell," when told that they knew. The supervisory nurse also advised that she had spoken with the pharmacist who said that a nurse had taken the wrong medication, to the wrong floor, and given it to the wrong patient.
 At approximately 6:30 p.m., Susan was advised by the supervisory nurse that Ron was dying, and that if there was anything they wanted to tell him, they needed to do so.
 The nurse further advised the family that Ron would be moved to the Cardiac Care Unit (CCU).
 Ron continued to weaken and get worse, but no hospital employee came to move him to CCU.
 Ron's whole family was called in to tell him goodbye.
 At approximately 8:00 p.m., Ron continued to worsen but still had not been moved to CCU. Susan made repeated inquiries as to why he had not been moved. She was informed that only one oxygen tank was available and it was being used by another patient.

*910  Susan finally enlisted the aid of her stepson and two hospital employees to move Ron and his supportive apparatuses to CCU.
January 1, 1996:
 Ron was told by Dr. Newcomb that "cardiac arrhythmia" was the cause of his condition and impending death.
 At some point, Ron was placed on Diltiazem Hydrochloride 60 mg, one every eight hours, and Lanoxin 25 mg, once every day "for his heart condition." (It was subsequently discovered by another staff, at another hospital, that Ron did not have a heart condition, and was removed from the heart drugs.)
January 16, 1996:
 Fluid was drawn from Ron's knees, which had gone unattended since his fall on December 29.
 This drawing of fluid was a deviation from the proper care and treatment of cancer patients, in that it is known to increase the risk of spreading of cancer.
January 18, 1996:
 Fluid was again drawn from Ron's knees.
 The family was informed that Ron had gotten a blood infection at the hospital.
January 22, 1996:
 The family was advised that Ron's heart was going to "play out first." Ron had never had any heart problems prior to this incident.
February 8, 1996:
 Ron was sent home.
 Due to his general condition and alleged "weak heart," he was no longer given radiation treatments (which he had been taking on a regular basis).
 No instructions were given for follow up treatment.
 Ron was completely bedridden and unable to care for himself. He never walked again.
March 30, 1996:
 Ron was not doing well. A home health care nurse began trying to reach Dr. Newcomb at 12:00 p.m. He finally returned her call at 4:35 p.m., but offered her no advice.
March 31, 1996:
 The home health care nurse again contacted Dr. Newcomb, who advised her to take Ron to the hospital.
 Ron was taken by ambulance to another hospital.
 Dr. Newcomb was called and asked to come see Ron, but Dr. Newcomb refused.
 Dr. Newcomb ordered a shot of morphine for Ron, and his advice was to take Ron home.
 Another oncologist was contacted who admitted Ron, to the hospital.
 A new tumor was immediately discovered and treated with radiation.
April 15, 1996:
 A heart echo test was done on Ron and his heart was found to be within normal limits.
April 16, 1996:
 Ron was removed from all heart medication that he had been placed on at Methodist.
*911 May 24, 1996:
 Ron continued to have severe pain in his legs and consulted an orthopaedic surgeon, Dr. Bryan Johnson.
 X-rays showed that Ron's right leg had been broken below the knee, which had never been discovered nor treated by Dr. Newcomb or the hospital.
 Johnson advised that draining the fluid had been an improper treatment for a cancer patient because if cancer was under the fluid, the draining would cause the cancer to spread.
CLAIMED INJURIES AND DAMAGES
 An aggravation or deterioration of renal cell carcinoma.
 Ron was exposed to extreme and excruciating physical pain and suffering.
 Ron was unable to continue his employment and suffered a great loss of income.
 Ron was deprived of and lost his enjoyment of life.
 He was never able to walk again, and was completely bedridden.
 The remainder of his available health insurance proceeds were used up because he had to be admitted to CCU as a result of the wrongful acts by the defendants. Medical Expenses were in excess of $100,000 as a result of Ron's stay in CCU.
 Ron was forced to endure pain and suffering at home with care primarily provided by his wife and stepdaughter because no more insurance was available.
 Ron endured extreme mental pain and suffering, anxiety and apprehension.
 Ron was not given the proper treatment for his renal cell carcinoma.
 Ron's life was shortened and made meaningless until the time of his death.
 Susan was deprived of consortium with her husband.
 Susan had to wait on Ron 24/7.
 She endured extreme and excruciating mental pain, anguish and suffering.
 She was deprived of her enjoyment of life.
 Susan had to expend her funds in connection with Ron's ongoing expense.

ASSIGNMENTS OF ERROR
¶ 5. Susan Dailey made the following assignments of error in this case:
I. WHERE A MALE PATIENT, SUFFERING FROM RENAL CELL CARCINOMA, WAS ERRONEOUSLY GIVEN A DRUG USED TO INDUCE LABOR WHICH WAS PRESCRIBED FOR A FEMALE PATIENT WITH A TOTALLY DIFFERENT NAME, ROOM NUMBER AND FLOOR OF THE HOSPITAL, AND WHERE ALL PATIENT AND DRUG INFORMATION WAS CLEARLY PRINTED ON THE IV BAG, THERE IS NO NEED FOR AN EXPERT IN THE FIELD TO ESTABLISH NEGLIGENCE.
II. THE LOWER COURT ERRED IN THE GRANT OF SUMMARY JUDGMENT IN FAVOR OF DR. MARTIN NEWCOMB.
III. THE LOWER COURT ERRED IN THE GRANT OF SUMMARY JUDGMENT IN FAVOR OF METHODIST MEDICAL CENTER, RENIDA DEE AND DARLENE BURT.
IV. THE LOWER COURT ERRED IN THE GRANT OF SUMMARY *912 JUDGMENT IN FAVOR OF SARAH GREEN.
In addition to these assignments of error, we will also address the cross-appeal filed in this case by defendant Sarah Green. She made the following assignments of error:
V. THE TRIAL COURT ERRED IN OVERRULING CROSS-APPELLANT'S MOTION TO DISMISS FOR FAILURE TO SERVE CROSS-APPELLANT WITHIN THE 120 DAY PERIOD PRESCRIBED BY M.R.C.P. 4(h).
VI. THE TRIAL COURT ERRED IN OVERRULING CROSS-APPELLANT'S MOTION TO DISMISS BECAUSE THE APPLICABLE STATUTE OF LIMITATIONS HAD RUN IN THE ACTION.

DISCUSSION

I. Necessity of Medical Expert
¶ 6. The supreme court handed down Coleman v. Rice, et al., 706 So.2d 696 (Miss.1997), a few days before the complaint in this case was filed. The court stated:
Our general rule is that medical negligence may be established only by expert medical testimony, with the exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience.
Id. at (¶ 10) (citing Erby v. North Mississippi Med. Ctr., 654 So.2d 495, 500 (Miss. 1995)). The Coleman court also stated that "[t]hough decided in 1916, Saucier [v. Ross, 112 Miss. 306, 73 So. 49 (1916) ] has never been overruled and remains the law in this jurisdiction...." Coleman at (¶ 12). The court in Saucier had held that a presumption of negligence is raised when a surgeon leaves a foreign object inside a patient. The rationale was set forth in the opinion as such:
Unexplained, the leaving of a four-inch rubber tube in a patient's body by a physician is negligence, and it occurs to us that it would be very difficult for a physician to explain how he could leave a rubber tube in a patient's body, until the wound healed over same, and not be guilty of negligence in the treatment of the patient.
Saucier, 112 Miss. at 314, 73 So. at 50. Susan argues that the rationale of Saucier can be applied to this case, in that the administering of a labor-inducing medicine to a male patient when all relevant information, including a female patient's name, was clearly printed on the IV bag, is negligence, and would be very difficult for a defendant to explain how he or she could administer the erroneous medication and continue to administer it for 11 hours and 15 minutes, during which time the hospital records show that defendants Dee, Burt, Green and Dr. Newcomb were in the room, and not be guilty of negligence. The only exculpating defense would be "sudden emergency," as held in Long v. Sledge, 209 So.2d 814, 819 (Miss.1968), but such was not the case here. (When in the opinion of the surgeon the life of his patient is being jeopardized by the operation, he has in some courts been exculpated from negligence in failing to make a thorough exploration before closing the incision.) Id.
¶ 7. The Coleman court stated that a layman can understand, without expert testimony, that the unauthorized or unexplained leaving of an object inside a patient is negligence. Susan argues that a layman can also understand, without expert testimony, that giving someone the wrong medication, and all the other alleged acts in the case sub judice, is negligence. Susan points out that the lower *913 court talked in terms of "negligence, prima facie" and "possibly negligence per se", but limited the terms to two elements of a medical negligence action, duty and breach of duty. Susan submits that one can not have a prima facie case of negligence or negligence per se unless all of the elements are present. She claims that the court should follow Saucier and Coleman which would lead to the conclusion that giving the wrong medication is negligence per se. Susan finally claims that the very least the court should have done was find, under Coleman, a presumption of negligence which the defendants could attempt to rebut or explain.

II. Summary Judgment for Newcomb
¶ 8. The court below granted summary judgment in three orders, one for Dr. Newcomb, one for Green, and one for Methodist Medical Center, Inc., Dee and Burk. In the memorandum opinion and order granting summary judgment for Dr. Newcomb, the judge stated as follows:
The Plaintiff has provided expert testimony from three witnesses, in an effort to establish a prima facie case of medical negligence against Dr. Newcomb. This testimony included the affidavits of Dr. Joseph Blackston, Susan Dailey and the supplemental affidavit of Dr. Arthur S. Hume.... In the opinion of the Court, the Affidavit of Joseph Blackston, while broad and vague, does narrowly create a genuine issue of material fact on the issues of duty and breach.... However, it is the opinion of the Court that neither the Affidavit of Dr. Blackston nor any other evidence of the plaintiff is sufficient to establish that any breach by Dr. Newcomb, or any of the other Defendants, proximately caused or contributed to any of the damages allegedly sustained by Ronald Dailey. It is further the Court's opinion that the medical testimony on behalf of the plaintiff is not sufficient on the issue of actual damages proximately caused or contributed to by Dr. Newcomb since the testimony does not establish any specific injury or damage.
(emphasis added.) Dr. Blackston stated in his affidavit that there is a medical probability that the negligence and breach of duty proximately caused hypotension, tachycardia and dyspnea associated with water retention, caused Lasix and cardiac medications to be administered, and caused Ron to be moved to CCU. Dr. Blackston stated that it is medically probable that the Pitocin exacerbated the effects of sepsis by affecting circulating blood levels of medication for sepsis. He also stated that due to pre-existing conditions, Ron was more susceptible to adverse reactions from Pitocin. Also, Dr. Hume's statement, the medical records, answers to interrogatories and other documents show damages for confinement to CCU, Lasix and other cardiac drugs of approximately $100,000.
¶ 9. The lower court stated in its opinion that Dr. Blackston's affidavit was insufficient to establish that any breach proximately caused or contributed to any of Ron's damages. However, if the affidavit established a duty, breach of duty and misdiagnosis by Dr. Newcomb, which proximately caused the administration of heart medication to a patient with no heart condition, Ron's admittance to CCU and depletion of his insurance coverage, halting of proper treatment for renal cell carcinoma, potential deprivation of enjoyment of life, and loss of income, plus pain and suffering, then a material fact question as to damages was created sufficient to avoid a summary judgment and take this case to trial. The affidavits show that Ron, a person without a heart condition, was given heart medicine, and that he, who had called for assistance which did not come, fell and injured his knees and was left *914 untreated to the point that his knees were painful and swollen, and that Ron, a cancer patient, could not continue to receive treatment, thereby negating the defendant's right to a judgment as a matter of law because of no material facts in dispute.
¶ 10. Palmer v. Anderson Infirmary Benevolent Assoc., 656 So.2d 790 (Miss.1995), cited in Susan's brief, is similar to this case. In that case, the breach of duty was failure to have two surgeons present during an operation. An expert did not testify of any causal relationship to damages, and refused to establish proximate cause. Yet this was not an impediment to the reversal of summary judgment. On a motion for summary judgment, the lower "court is prohibited from trying the issues; it may only determine whether there are issues to be tried." Id. at 795. The fact that the expert was unable to give a definite opinion established that there was sufficient testimony to create a jury question regarding the causal connection. "Summary judgment is not a substitute for trial regarding disputed issues of fact." Id. at 796.
¶ 11. Susan also cites Davidson v. North Central Parts, Inc., et al., 737 So.2d 1015 (Miss.Ct.App.1999), for these propositions:
 Evidentiary matters are viewed in light most favorable to non-moving party, who is given benefit of every reasonable doubt.
 Central focus is whether there were "genuine issues of material fact."
 Fact is considered material if it has a tendency to decide any of the issues of the case which have been properly raised.
 This Court must find beyond a reasonable doubt that no genuine issue of material fact exists before it affirms a summary judgment.
 Summary judgment is not to resolve issues of fact but to determine whether issues of fact exist.
 Above all, a trial court should take great care in granting a motion for summary judgment.
 If the trial court is doubtful as to whether a genuine issue of material fact exists, it should deny the motion for summary judgment.
Id. at (¶ 3). It would appear that the court below overstepped its boundaries in deciding a jury issue as to whether the evidence sufficiently established proximate cause and damages.
¶ 12. The court stated that the plaintiff is required to produce testimony from a qualified medical expert witness to establish the elements of duty, breach, proximate cause and damages in this case. Susan argues that "[i]ssues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt." Quinn v. Miss. State Univ., 720 So.2d 843 (¶ 10) (Miss.1998).
¶ 13. Dr. Newcomb makes the claim that Susan has failed to show that Ron actually suffered injury because of the administration of Pitocin, and the misguided argument that Susan has not provided any expert testimony which establishes the amount of damages Ron suffered. It is medical negligence which must be proven by expert testimony, not the amount of damages. "Where the existence of damages has been established, a plaintiff will not be denied the damages awarded by a fact finder merely because a measure of speculation and conjecture is required in *915 determining the amount of the damages." TXG Intrastate Pipeline Co. v. Grossnickle, 716 So.2d 991 (¶ 86) (Miss.1997) (emphasis added).
¶ 14. The Mississippi Supreme Court in Boyd v. Lynch, 493 So.2d 1315 (Miss.1986), found that a statement of the substantive law relating to a physician's duty was in order. The court then reaffirmed the duty as stated in Hall v. Hilbun, 466 So.2d 856 (Miss.1985), as follows:
In the care and treatment of each patient, each physician has a non-delegable duty to render professional services consistent with that objectively ascertained minimally acceptable level of competence he may be expected to apply given the qualifications and level of expertise he holds himself out as possessing and given the circumstances of the particular case. The professional services contemplated within this duty concern the entire caring process, including but not limited to examination, history, testing, diagnosis, course of treatment, medication, surgery, follow-up, after-care and the like.
Boyd, 493 So.2d at 1317-18 (emphasis added). The substantive law concerning the non-delegable duty of care is repeated in Harris v. Shields, 568 So.2d 269 (Miss. 1990). The Harris case points out the facts of Hall, in which a post-operative patient awakened and complained repeatedly of pain and difficulty in breathing. The nurses in Hall did nothing until it was too late, and the patient died. The Hall court found that the plaintiff had proffered evidence adequate that a jury might find the surgeon's deficiencies proximately contributed to his patient's death, and overruled a directed verdict. Harris, 568 So.2d at 274. The Harris court contrasted the Boyd case, in which it was held that the plaintiff failed to provide any evidence that the doctor's failures caused or contributed to the patient's death. Id. In Boyd, the plaintiff brought her two-year-old son to the hospital for emergency treatment during hours when Dr. Lynch was on call. Id. The attending nurse examined the child and called Dr. Lynch, describing the child's symptoms. Dr. Lynch ordered additional tests, but did not come to the hospital until later that morning, at which time the child was pronounced dead. Id. The child died of epiglottitis, a "very rare and extreme form of respiratory ailment" that Dr. Lynch had never seen in forty years of practice. Boyd, 493 So.2d at 1317.
¶ 15. In the case sub judice, Susan has shown through the affidavits of Drs. Blackston and Hume, that the administration of Pitocin probably proximately caused hypotension, tachycardia and dyspnea associated with water retention, caused Lasix and cardiac medications to be administered, caused Ron to be moved to CCU, and probably exacerbated the effects of sepsis, as well as showing monetary damages. Dr. Newcomb does have non-delegable duties, including diagnosis, course of treatment, prescription of medicine, continuing care, etc. Although the administration of the wrong medicine by a nurse may not have been included in those duties, in this case it does not matter that a nurse actually delivered the Pitocin into Ron's IV because the fact scenario indicates that Dr. Newcomb came into Ron's room, saw that he was swollen, and ordered Lasix to counter-act the swelling, without checking to see what drug was being administered or at what rate. The lower court even found the evidence to show a duty and breach. This Court fails to understand the lower court's opinion that the evidence was not sufficient to survive summary judgment. We must view the evidence in the light most favorable to the non-moving party, and give her *916 the benefit of all favorable inferences that may reasonably be drawn from the evidence. "If the evidence, so viewed, is such that reasonable and fair-minded jurors might differ on the material facts, the law commands that the Court deny the motion." Harris, 568 So.2d at 275 (citations omitted). This Court does not set out to finally determine negligence nor the extent of damages; "however, if we find that there are disputed issues which are material to the case, we will reverse, for the purpose of a summary judgment is not to resolve issues of fact but to determine whether issues of fact exist." Davidson v. North Central Parts, Inc., 737 So.2d 1015, 1016 (Miss.App.1999). Therefore, the lower court's grant of summary judgment is hereby reversed and the case remanded for a trial on the merits.

III. Summary Judgment for Methodist Medical Center, Renida Dee and Darlene Burt
¶ 16. In the order granting summary judgment for Methodist Medical Center, Renida Dee and Darlene Burt, the lower court upheld their objection to the use of Dr. Blackston's affidavit which was filed after the hearing on the motion. Dr. Newcomb and Sarah Green did not object to its use. The lower court stated in its order granting summary judgment to these defendants that the plaintiff appears to raise the issue of whether the defendants met the standard of care applicable to a minimally competent medical facility, and that this is not within the common knowledge of a lay person. Susan argues that it is common knowledge that the wrong medicine should not be administered to a patient. Further, the nurses admitted in their depositions that they breached their duty, and Dr. Hume, though a qualified expert toxicologist and not a medical doctor, testified in his deposition as to the adverse affects of erroneously administered Pitocin. Dr. Hume attributed hypotension, tachycardia and dyspnea associated with the water retention, to have been caused by the Pitocin. He stated that Ron went on coronary drugs after the Pitocin and opined that it was the proximate cause of the need for coronary drugs. Dr. Hume testified that Pitocin affects the antidiuretic hormone resulting in retention of water which can result in an increased workload on the heart.
¶ 17. After the hearing, Susan submitted a supplemental affidavit from Dr. Hume stating that he had based his opinion on the presumption that only 10 cc's of Pitocin were administered in the IV, however, he subsequently learned that the dosage was 30 cc's which would have had an even greater adverse affect than he originally discussed. The court opined that the hospital records and deposition testimony of the nurses established negligence, prima facie and possibly per se, regarding duty and breach of duty, but that Susan offered no competent and credible medical evidence of proximate cause or identifiable injuries or damages.
¶ 18. The Methodist defendants argue that the fact Pitocin may have caused change in blood pressure or heart rate is not a compensable harm, but offer no authority. This appears to be the line of reasoning that the court used in stating there was no evidence of identifiable injuries. Susan states that while the defendants admit "physiological effects", they play in semantics, claiming there was no "medical harm" caused by the improper drug. Susan argues that all the law requires is that the plaintiff show injury or damages proximately caused by the erroneous medication, which she claims is shown by Dr. Hume's deposition. Susan points out Dozier v. State, 247 Miss. 850, 853, 157 So.2d 798, 799 (1963), which reiterated that when no authority is cited for a *917 proposition, "there is the practical presumption that the authorities do not sustain the proposition ...." (citations omitted.) Additionally, Susan points out the definition of injury from Black's Law Dictionary 785 (6th ed.1990): any wrong or damage done to another, either in his person, rights, reputation, or property. Susan states that what the Methodist defendants are really arguing is degree of injury and amount of damages, which are always questions left to the jury, subject to the court's instructions.
¶ 19. After stating that Susan offered no competent and credible medical evidence of proximate cause or identifiable injures, the court stated:
To the contrary, the Defendants offered competent and credible evidence through the Affidavits of Drs. Bennett and Thigpen that "the Pitocin did not cause any injury or damages to Mr. Dailey ...", more specifically as set forth in their Affidavits.
What the court apparently failed to realize is that the defendants never presented any affidavits from Drs. Bennett and Thigpen. The document elevated to the level of competent, credible affidavits was the defendants' disclosure of expected testimony from their experts. Nothing was ever signed or sworn to by Drs. Bennett and Thigpen, as were the deposition testimonies of the nurses and Dr. Hume.
¶ 20. Susan argues that under Davidson, 737 So.2d at (¶ 12), "[a] movant must establish the propriety of relief by the strengths of his own showing, not by the defects in his opponents showing...." She maintains that documents which are merely outlining expected testimony of an expert witness are neither "affidavits" nor "evidentiary documents" required under Rule 4.03, UCCCR, although they were elevated to such status by the lower court. Susan argues that under M.R.C.P. 56(c), the disclosures of expected testimony are not "pleadings, depositions, answers to interrogatories and admissions on file, [or] affidavits" upon which a summary judgment may be rendered.
¶ 21. As previously stated, the burden of demonstrating that no genuine issue of fact exists is on the moving party, and the non-movant is given the benefit of the doubt. Quinn, 720 So.2d at (¶ 10). The lower court's decision to grant summary judgment for the Methodist defendants and Sarah Green was based on the erroneous assumption that Drs. Bennett and Thigpen had submitted affidavits. Additionally, the lower court deemed it necessary for proximate cause and damages to be proven by medical experts, stating that the issue is out of the common knowledge of a lay person. We find no other case where a labor-inducing drug was administered to a male cancer patient, but it is quite within common knowledge that the wrong drug should not be administered to a patient. Also, Dr. Hume, a toxicologist, appears as qualified as any medical doctor to testify as to the adverse effects of a drug on a patient, thus his deposition establishes an issue of proximate cause and damages. Even without the affidavit from Dr. Blackston, Susan has met the requirement to survive summary judgment of showing that a genuine issue of material fact does exist. Spartan Foods Systems, Inc., 582 So.2d at 402. Therefore, the summary judgment as to these defendants is reversed.

IV. Summary Judgment for Sarah Green
¶ 22. In its order granting summary judgment in favor of Sarah Green, the lower court relied upon its opinion and reasoning in granting summary judgment for the Methodist Defendants. As we have found the lower court to have erred *918 in its grant of summary judgment for the Methodist Defendants, as well as for Dr. Newcomb, we also find error in the grant of summary judgment for Green.

CONCLUSION
¶ 23. Under the Mississippi Rules of Civil Procedure, one seeking summary judgment must prove the non-existence of a genuine issue of material fact by way of evidence specified in Rule 56(c). Generally, a plaintiff must have shown medical negligence by expert testimony, unless the negligence is within the common knowledge of a layperson. To survive summary judgment, the non-movant must show that a genuine issue of material fact does exist. As stated, Susan has shown through affidavits, depositions, and answers to interrogatories that a material issue of fact does exist, or otherwise through the common knowledge of a lay person. The defendants have failed to provide evidence required under Rule 56(c) to prove the non-existence of a genuine issue of material fact. Therefore, the summary judgments granted to the defendants are reversed.

V. & VI. Cross-Appeal Filed by Sarah Green

PROCEDURAL HISTORY
¶ 24. Service of process was not perfected on defendant Sarah Green until October 28, 1998, though the complaint was filed on December 19, 1997. Green filed her answer and moved for dismissal pursuant to M.R.C.P. 4(h). This motion was overruled. Susan Dailey filed her appeal after the defendants' motions for summary judgment were granted. Green then filed this cross-appeal. Finding no error, we now affirm.

STANDARD OF REVIEW
¶ 25. Rule 4(h) of the Miss. Rules of Civil Procedure provides a limit of 120 days to perfect service unless there is good reason for delay. The court has discretion as to what constitutes good cause. The court in Rains v. Gardner, 731 So.2d 1192 (¶ 18) (Miss.1999), stated that "a determination of `good cause' would be a discretionary ruling on the part of the trial court and entitled to deferential review of whether the trial court abused its discretion and whether there was substantial evidence supporting the determination."

DISCUSSION
¶ 26. Green admits that Franklin Evans, process server, set out in his affidavit the measures taken and difficulty in locating Green to serve her. However, she claims that it does not rise to the level of excusable neglect, especially since requesting more time would have imposed no great hardship on Susan. Susan argues, as shown by the court's order denying the motion to dismiss, that she did, in fact, show good cause why service of process was not completed within the 120 days.
¶ 27. Green claims that the statute of limitations under Miss.Code Ann. § 15-1-36 had run due to Susan's failure to timely serve Green. She contends the time began to run again at the end of 120 days since no extension was obtained, and claims that if the case should have been dismissed, the statute of limitations expired before she was served. Susan argues that the filing date "obtains for statute of limitation purposes whenever the action is not dismissed...." Crumpton v. Hegwood, 740 So.2d 292 (¶ 9) (Miss.1999). Since the suit was not dismissed, the filing date controls the statute of limitations issue. Susan argues that Rule 4(h) was not designed to deprive a litigant of her day in court, but rather serves the same function *919 as the old "stale case" doctrine. If this were not so, Susan contends, the rule would allow defendants to hide out for the time period necessary to avoid the suit.
¶ 28. Green replies that a defendant's knowledge of a pending suit does not allow a court to take action upon that party without giving him an opportunity to be heard and cites Mosby v. Gandy, 375 So.2d 1024, 1027-28 (Miss.1979), which states:
In the absence of process on a defendant, even though the defendant may know of the pendency of the action, defendant's knowledge of the existence of the action does not supply the want of compliance with the requirements of valid process.
. . .
It is now so thoroughly well settled as to make it too late to urge that knowledge by a defendant ... or whatever may have been the defendant's action under that knowledge, is of any avail or advances the case a step, unless there has been a legal summons or a legal appearance.
Green further argues that in Crumpton, the plaintiff obtained an extension for service. However, the plaintiff did not ask for an extension until one year and nine months after filing the complaint-far beyond the 120 day limitation. Id. at (¶ 2). The defendant in Crumpton filed a motion for summary judgment based on the contention that the statute had run after the end of the initial 120 days, and that the extension could not revive what was already dead. Id. at (¶ 4). The supreme court pointed out that the case had never been dismissed and never became a nullity as in Watters v. Stripling, 675 So.2d 1242, 1243-44 (Miss.1996). Therefore, the statute was tolled by the filing of the complaint. Crumpton, 740 So.2d at (¶ 10). Green complains that Susan never asked for, nor received, an extension to serve her. However, Susan was, in effect, given an extension when the court found good cause for the delay in service.
¶ 29. Green also complains that her address was available all the time, that Susan just neglected to go get it, as shown by the fact that Susan finally got the information by way of a routine subpoena duces tecum to Methodist Hospital. Susan shows by Evans's affidavit that, when asked, Methodist said they had absolutely no information on where Green could be served, or where she could be found. Methodist then suggested that Evans contact a couple of nursing services, which he did to no avail.
¶ 30. Susan argues that Green had representation and was preparing for the suit far in advance of the filing of the claim. Susan offers letters and states that she was advised by Green's attorney of his representation and his request for authorization from the plaintiff to obtain medical records. Green's attorney was provided copies of all pleadings and correspondences. Green was aware of and able to monitor the lawsuit through her attorney, yet took the position that he was unauthorized to accept service for her.

CONCLUSION
¶ 31. The court below inquired as to whether any harm, prejudice or hardship stemming from the delay in service was claimed by Green. She made no such claim then and makes no such claim now. The case was not dismissed after the 120 day service period, nor before the plaintiff showed good cause to the court for the delay in service. The filing of the complaint, therefore, controlled the statute of limitations. The lower court did not abuse its discretion in overruling Green's motion to dismiss, and is affirmed.
*920 ¶ 32. THE JUDGMENTS OF THE HINDS COUNTY CIRCUIT COURT GRANTING SUMMARY JUDGMENT ARE REVERSED AND REMANDED FOR TRIAL ON THE MERITS. COSTS ARE ASSESSED AGAINST THE APPELLEES.
¶ 33. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT DENYING THE MOTION TO DISMISS IS AFFIRMED. COSTS ARE ASSESSED AGAINST THE CROSS-APPELLANT.
ISSUES I-VI: KING, P.J., BRIDGES, LEE, IRVING, AND MYERS, JJ., CONCUR.
McMILLIN, C.J., CONCURS IN PART AND DISSENTS IN PART JOINED BY SOUTHWICK, P.J. CHANDLER, J., JOINS REGARDING SARAH GREEN. THOMAS, J., JOINS REGARDING DR. NEWCOMB.
CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART.
THOMAS, J., CONCURS IN PART AND DISSENTS IN PART.
McMILLIN, C.J., concurring in part, dissenting in part:
¶ 34. I concur in part and dissent in part. As to the erroneous administration of Pitocin to Mr. Dailey, I would agree that the question of whether administering the wrong drug from a plainly-labeled IV bag is an act of negligence is one a jury could pass upon without the aid of expert testimony under the rule announced in Coleman v. Rice, 706 So.2d 696 (¶ 10) (Miss.1997). I concede, as the trial judge noted, that proof of damage is an essential element of a claim for negligence; however, I understand the rule regarding the need for expert testimony as announced in cases such as Coleman v. Rice to actually relate only to two other elements of a negligence claim, i.e., duty and breach of duty. There is, for example, no discussion in Coleman v. Rice as to the presence or absence of evidence, at the summary judgment stage, that the sponge inside Coleman's body caused any particular injury to her. Thus, as to those defendants shown to have some direct responsibility in the physical act of obtaining and administering the correct drug, I would agree that summary judgment was inappropriate on that one issue.
¶ 35. I would affirm the grant of summary judgment in favor of Dr. Newcomb. There is no indication that he played any direct part in the administration of a drug different from that directed by his orders. I would not think that a treating physician's standard of care extends to physically checking behind his orders to ensure that the proper drug is being given. That would appear unreasonably burdensome and, in such instances as when drugs are ordered from remote locations, an impossible standard to meet. Certainly, if Dr. Newcomb's duty to assure that his patient was in fact receiving the correct drug was the standard of care, it was the plaintiff's duty to establish that standard by expert testimony since it is not capable of being determined by laymen unfamiliar with hospital processes.
¶ 36. I would reverse and render on Sarah Green's cross appeal. In her motion to dismiss, Green pointed out that, though the complaint had been filed on December 19, 1997, she was not served until October 28, 1998. This period far exceeded the 120 days contemplated for service of a complaint set out in Mississippi Rule of Civil Procedure 4(h) and Green sought dismissal on that basis. Under the rule, it was the plaintiffs duty to show "good cause" as to why service had not been completed in order to avoid a dismissal *921 with prejudice. The plaintiff sought to establish good cause by filing the affidavit of the process server. He reported that he had been retained to serve process on Green on the date suit was filed and that his attempts to perfect service had been to seek, without success, to obtain her address from the Methodist Medical Center personnel office, two nursing service organizations, and the State Nursing Board. He then claimed to have called every Green in the telephone directory asking "is there a Sarah Green there who used to work for Methodist Hospital." Case law has equated "good cause" with "excusable neglect." Watters v. Stripling, 675 So.2d 1242, 1243 (Miss.1996). Finding these rather perfunctory, though perhaps tedious, efforts to locate Green to be an inexcusable disregard for the duty to proceed toward serving a defendant with some minimal measure of diligence, I would conclude that no good cause was shown as to why Green was not served until over 300 days after the filing of the complaint. Even under the limited review authorized by an "abuse of discretion" standard, I would reverse the trial judge on this score and dismiss Green as a defendant without prejudice under Rule 4(h). Rains v. Gardner, 731 So.2d 1192 (¶ 19) (Miss.1999).
¶ 37. Finally, though the complaint in this case recited a long list of grievances in the manner of Mr. Dailey's treatment, the case on remand ought to be limited to the issue of the improper administration of the wrong drug and the injury, if any can be shown, to have been proximately caused thereby since, as to all other complaints, the lack of expert evidence establishing the standard of care is fatal. Erby v. North Miss. Medical Center, 654 So.2d 495, 500 (Miss.1995).
SOUTHWICK, P.J., JOINS THIS SEPARATE WRITTEN OPINION. THOMAS AND CHANDLER, JJ., JOIN IN PART.
THOMAS, J., concurring in part, dissenting in part:
¶ 38. I concur with the majority regarding the disposition of Methodist Medical Center, Sarah Green, Renida Dee and Darlene Burt. I join Chief Judge McMillin's dissent regarding Dr. Martin Newcomb.
CHANDLER, J., concurring in part, dissenting in part:
¶ 39. I concur with the majority insofar as it reverses the summary judgments granted to Methodist Medical Center, Renida Dee, Dr. Martin Newcomb, and Darlene Burt. Although I join the majority in reversing summary judgment on these defendants, I have some doubt whether there is sufficient evidence to show that Darlene Burt breached her duty and caused damage to the appellant. I join with Chief Judge McMillin's dissent regarding Sarah Green.