929 So.2d 924 (2005)
James W. PARTIN, Executor of the Estate of Shirley Howard Partin, Deceased, Appellant
v.
NORTH MISSISSIPPI MEDICAL CENTER, INC.; W. Thomas Oakes, M.D.; Richard Sharp, M.D.; and Laura Gray, M.D., Appellees.
No. 2003-CA-02206-COA.
Court of Appeals of Mississippi.
July 19, 2005.
Rehearing Denied December 13, 2005.
*926 J. Joshua Stevens, Jr., West Point, attorney for appellant.
Jason E. Dare, L. Carl Hagwood, Jackson, Shelby Duke Goza, Oxford, Robert K. Upchurch, John G. Wheeler, Tupelo, J. Dennis Coleman, S. Kirk Milam, attorneys for appellee.
EN BANC.
MYERS, J., for the Court.
¶ 1. On December 28, 2001, the executor of the estate of Shirley Howard Partin ("Partin"), filed a complaint against North Mississippi Medical Center, Inc. ("NMMC"), Dr. Thomas Oakes, Dr. Richard Sharp, and Dr. Laura Gray, alleging medical malpractice and wrongful death. Soon thereafter, three of the four defendants/appellees filed motions for summary judgment, and in response, on September 23, 2002, Partin filed a motion for discovery conference and/or pre-trial conference and for stay of motions for summary judgment.
¶ 2. On March 24, 2003, Dr. Oakes filed his motion for summary judgment, and on March 28, 2003, the motions came on for hearing. On August 26, 2003, the court denied Partin's motion for discovery conference and/or pre-trial conference and for stay of motions for summary judgment and granted all of the appellees' motions for summary judgment, including Dr. Oakes's motion, which had been filed only four days prior to the hearing.
¶ 3. Aggrieved by the grant of the appellees' motions for summary judgment, Partin now appeals, raising two issues:

*927 I. DID THE TRIAL COURT ERR IN GRANTING THE APPELLEES' MOTIONS FOR SUMMARY JUDGMENT?
II. DID THE TRIAL COURT ERR IN DENYING PARTIN'S MOTION FOR DISCOVERY CONFERENCE AND/OR PRE-TRIAL CONFERENCE AND FOR STAY OF MOTIONS FOR SUMMARY JUDGMENT?
¶ 4. Finding no error in the granting of summary judgment to Dr. Sharp and Dr. Gray, we affirm the judgment of the circuit court as to Dr. Sharp and Dr. Gray. Finding error in the granting of summary judgment to NMMC and Dr. Oakes, we reverse the judgment of the circuit court as to NMMC and Dr. Oakes and remand for further proceedings consistent with this opinion.

FACTS
¶ 5. On December 10, 1999, Shirley Partin had minor surgery on her ear. On December 13, 1999, Mrs. Partin was admitted to NMMC to have certain postsurgery complications treated. Mrs. Partin was diagnosed as having suffered a mild stroke (blood vessel infarctions in the brain), and from December 13, 1999, to December 23, 1999, Mrs. Partin was treated at NMMC. She was under the care of Dr. Oakes during this time.
¶ 6. On December 24, 1999, Mrs. Partin was transferred to NMMC's rehabilitation unit, where she came under the care of Dr. Sharp. On December 25, 1999, Mrs. Partin was allowed to go home for a few hours, after which she returned to the hospital.
¶ 7. On the afternoon of December 30, 1999, Dr. Sharp informed the Partin family that Mrs. Partin's most recent tests showed no change in her condition. Having determined no immediate danger to Mrs. Partin, Dr. Sharp told the family that he would be going out of town for the weekend, leaving another doctor, Dr. Gray, in charge of Mrs. Partin's care in his absence. Later in the day on December 30, 1999, Mrs. Partin's condition began to worsen, and the family became very alarmed by the symptoms she exhibited. Members of the Partin family at this time told nurses at the hospital of Mrs. Partin's condition and urged the nurses to contact the on-call doctor. The nurses gave Mrs. Partin some medications and said that they would wait to see how she responded before contacting the doctor.
¶ 8. Continuing throughout the day and night of December 30, 1999, and through the early morning hours of December 31, 1999, Mrs. Partin's condition continued to worsen, and the family, gradually beginning to become "frantic" in light of Mrs. Partin's condition and the hospital's inaction, continued strongly to urge the nursing staff to contact a doctor. Among the symptoms Mrs. Partin exhibited were: she was cyanotic, with labored breathing and hypotension, restlessness and agitation, a highly elevated white blood cell count, a sharp decrease in blood pressure, a sharp increase in pulse rate, vomiting a green material, and increasing unresponsiveness.
¶ 9. Roughly twenty hours after the onset of Mrs. Partin's alarming symptoms, at around 6:30 a.m. on December 31, 1999, the hospital finally contacted Dr. Gray, who ordered that certain medications be given to Mrs. Partin. Roughly forty minutes later the hospital again contacted Dr. Gray, who at that point ordered that the internist in the hospital be called immediately to examine Mrs. Partin. Dr. Charles K. Hill, the internist at the hospital, arrived very soon thereafter (roughly ten to twenty minutes later), but, unfortunately, he was too late to halt Mrs. Partin's demise. Dr. Hill found Mrs. Partin in an *928 irreversible state of septic shock. Mrs. Partin died at 3:30 a.m. on January 1, 2000. The cause of death was listed as septic shock, secondary to a urinary tract infection.
¶ 10. On December 28, 2001, the executor of Mrs. Partin's estate, James W. Partin, filed his complaint against NMMC, Dr. Oakes, Dr. Sharp and Dr. Gray, alleging medical malpractice and wrongful death. Partin did not find any fault with the "heroic" attempts of Dr. Hill to save Mrs. Partin, noting that Dr. Hill responded immediately and in person upon being notified of Mrs. Partin's condition. Thus, Dr. Hill was not named in the suit. On March 25, 2002, the last of the answers of the separate defendants was filed. Within roughly five months, on August 8, 2002, the first of the defendants' motions for summary judgment was filed. Shortly thereafter, two other motions for summary judgment were filed, and in response, on September 23, 2002, Partin filed a motion for discovery conference and/or pre-trial conference and for stay of motions for summary judgment.
¶ 11. On March 24, 2003, Dr. Oakes filed his motion for summary judgment, and on March 28, 2003, the motions came on for hearing. After the hearing, the court took the motions under advisement. On July 11, 2003, the court sent a letter to the attorneys stating that Partin's motion was denied and that the summary judgment motions of all the appellees were granted. No reasons were stated for the ruling in this letter. The letter instructed the appellees' counsel to prepare an order and to deliver the order to Partin's attorney for approval as to form only. The order drafted by the defendants' counsel, signed by the judge on August 26, 2003, and filed on September 5, 2003, contained several findings that were not specifically articulated by the trial judge anywhere in the record. However, the trial judge signed the order, adopting those findings that were proposed by the appellees' attorneys.

LEGAL ANALYSIS

I. DID THE TRIAL COURT ERR IN GRANTING THE APPELLEES' MOTIONS FOR SUMMARY JUDGMENT?
¶ 12. Partin argues generally that there were genuine issues of material fact; therefore, the trial court should not have granted the appellees' motions for summary judgment. Below we will address the various particular points Partin makes in support of that overarching argument. The appellees generally argue that Partin failed to demonstrate a triable issue of fact by the use of expert medical affidavit or testimony and that, therefore, summary judgment was proper. We will discuss each of the appellees' particular arguments below.

STANDARD OF REVIEW
¶ 13. Our standard of review for this issue has been stated as follows:
Our appellate standard for reviewing the grant or denial of summary judgment is the same standard as that of the trial court under Rule 56(c) of the Mississippi Rules of Civil Procedure. This Court employs a de novo standard of review of a lower court's grant or denial of summary judgment and examines all the evidentiary matters before itadmissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact and, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the *929 motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant should be given the benefit of the doubt.
Williamson ex rel. Williamson v. Keith, 786 So.2d 390, 393(¶ 10) (Miss.2001) (quoting Heigle v. Heigle, 771 So.2d 341, 345(¶ 8) (Miss.2000)). We have also held that the non-moving party must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Dailey v. Methodist Medical Center, 790 So.2d 903, 915-16(¶ 15) (Miss.Ct. App.2001).

DISCUSSION
¶ 14. For purposes of clarity, we will discuss this issue as it relates to each of the appellees separately. Before moving to our discussion of each separate appellee, however, we will briefly discuss the general requirements for summary judgment in a medical malpractice case.
¶ 15. In medical malpractice cases, our law requires that the plaintiff demonstrate four things by expert medical evidence, after having established the doctor-patient relationship: (1) standard of care/duty, (2) breach of the standard of care/duty, (3) causal connection between the breach and the injury/death, and (4) the extent of the plaintiff's damages. McCaffrey v. Puckett, 784 So.2d 197, 206(¶ 33) (Miss.2001). Upon a motion for summary judgment filed by the defendants, while the plaintiff does have the positive duty to show that genuine issues of material fact exist, the ultimate burden is upon the movant to prove the non-existence of genuine issues of material fact. Dailey, 790 So.2d at 918(¶ 23). In order for the plaintiff to fulfill its burden, the plaintiff must put on some evidence by expert testimony or affidavit, unless the issues are within the common knowledge of a layperson, and that evidence must be such that fair-minded jurors might, in light of that evidence, differ on the material facts. Dailey, 790 So.2d at 915-16(¶ 15).
¶ 16. However, as noted above in our statement of the standard of review, the evidence presented by the plaintiff must be given the benefit of all favorable inferences that may reasonably be drawn therefrom. Id. At the summary judgment level, "the court does not set out to finally determine negligence nor the extent of damages;" rather, the court upon a motion for summary judgment, merely determines if there are any disputed material issues of fact when the plaintiff's evidence is given the benefit of all reasonable inferences in its favor. Id.

North Mississippi Medical Center, Inc.
¶ 17. As noted above in our recitation of the facts, NMMC did not notify Dr. Gray of the situation with Mrs. Partin until around 6:30 a.m. on December 31, 1999. Partin argues that Mrs. Partin's problems began on the afternoon of December 30, 1999, and Partin also argues that he and other family members pleaded with the hospital to call a doctor for roughly twenty hours. There is some suggestion in the record that NMMC told the Partins that a doctor had been called on December 30, 1999, but it appears that NMMC actually did not contact the on-call doctor, Dr. Gray, until early in the morning (around 6:30 a.m.) of December 31, 1999. By that time, according the affidavit of Partin's medical expert, Mrs. Partin's condition had become irreversible.
¶ 18. NMMC argues in a general sense that Partin failed to provide significant probative evidence, by expert medical testimony *930 or affidavit, of all the essential elements of his claim. More specifically, NMMC argues that Dr. Holzhauer, Partin's proffered medical expert, was not qualified to give expert testimony and, in any event, did not provide sufficient evidence of the three required elements of (1) standard of care, (2) breach, and (3) causation. We will first examine the issue of Dr. Holzhauer's qualifications, and then proceed to discuss the content of his affidavit.
¶ 19. NMMC argues that Dr. Holzhauer, as an Obstetrician/Gynecologist ("OB/GYN"), was not qualified to testify to the issues of standard of care, breach, and causation relating to the hospital, particularly the hospital's nursing staff. Based upon our review of the record, we disagree.
¶ 20. We find that the fact that Dr. Holzhauer is an OB/GYN does not by itself dispose of the question of his qualifications to testify to proper hospital procedures, including the procedures nurses should follow when a patient's condition worsens. His qualifications to testify to these particular issues may not be determined, as NMMC and the other appellees incorrectly argue, by merely stating that Dr. Holzhauer is an OB/GYN. Whether any doctor may testify to a particular matter depends upon his knowledge, training, experience, and the like, and, while an expert's testimony will be limited to his or her demonstrated area of expertise, there is nothing in our law that prevents an OB/GYN (or some other kind of specialist, for that matter) from having expertise in general hospital procedures as well as another speciality or area. Brown v. Mladineo, 504 So.2d 1201, 1202-03 (Miss.1987); Cowart v. State, 910 So.2d 726, 729-30 (¶¶ 15-18) (Miss.App.2005).
¶ 21. Our case law, in addition to the plain language of Rule 702 of the Mississippi Rules of Evidence, leaves little doubt about this point. On the subject of an expert's qualifications generally we have held:
A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify and offer opinions if his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." M.R.E. 702. However, this Court will limit an expert's testimony to matters within his demonstrated area of expertise.
Community Bank, Ellisville, Mississippi v. Courtney, 884 So.2d 767, 781(¶ 52) (Miss.2004). We have also held that "[w]hether an expert witness is qualified to testify is within the trial court's discretion. The test is whether a witness `possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman.'" Nunnally v. R.J. Reynolds Tobacco Co., 869 So.2d 373, 384(¶ 36) (Miss.2004) (citations omitted). Thus, as long as the witness possesses, in several different areas, that "peculiar knowledge . . . not likely to be possessed by a layman," the witness may be qualified to testify as an expert in those different areas. Id. Applying that rationale to this case, we find that the mere fact that Dr. Holzhauer is an OB/GYN does not by itself disqualify him from testifying to standard of care, breach, and causation regarding the claim against NMMC. The question is not whether Dr. Holzhauer is an OB/GYN or some other specialist (although we do not deny the relevance of that question), but rather, the question is whether Dr. Holzhauer had the knowledge, skill, training, and experience to possess that "peculiar knowledge" requisite to offering expert opinion regarding the claim against NMMC.
*931 ¶ 22. The principles we have been discussing above find helpful expression in the case of Brown v. Mladineo, cited above. The facts of the Brown case are rather disturbing, and we will, therefore, refrain from citing the facts of that case. Suffice it to say that the Brown court held, "`[I]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility.'" Brown, 504 So.2d at 1202 (citing Fitzmaurice v. Flynn, 167 Conn. 609, 356 A.2d 887, 892 (1975)). The Brown court also declared, clarifying the holding of Hall v. Hilbun, "It was not our intent to adopt a uniquely restrictive standard by holding that only a specialist can testify about the standards of his own specialty." Brown, 504 So.2d at 1203 (commenting upon Hall v. Hilbun, 466 So.2d 856, 874-75 (Miss.1985)). All of this serves to bolster our conclusion that even though Dr. Holzhauer was not, by specialty or title a nurse or hospital administrator, he very well could have testified to the general requirements of hospitals and nurses, provided that he had the requisite knowledge, training, and experience.
¶ 23. ¶ In that regard, the record shows that Dr. Holzhauer is a board certified OB/GYN, practicing in Columbus, Mississippi. He has extensive experience working in a hospital setting, having treating hundreds of patients in hospitals. He has maintained hospital privileges at a number of hospitals and is currently on the staff of Baptist Memorial Hospital-Golden Triangle in Columbus, Mississippi. He also has a very respectable academic history. Given this training, experience, and corresponding knowledge, it appears that Dr. Holzhauer was qualified to testify to the general standard of care and duties of a hospital to a patient, at the very least so as to demonstrate a genuine issue of material fact. At trial, the jury may decide to discredit Dr. Holzhauer's opinions, or the court, upon voir dire and tender of Dr. Holzhauer as an expert, may limit the matters to which he may testify, but as the record before us stands, it is clear that Dr. Holzhauer was qualified to give an expert opinion sufficient to create a fact issue that would preclude summary judgment as to NMMC.
¶ 24. Therefore, we disagree with NMMC's argument that Dr. Holzhauer was not qualified to provide expert medical evidence, as required in medical malpractice cases in Mississippi. We agree with Partin's argument that Dr. Holzhauer was qualified as an expert and that the weight and credibility to be given to his testimony are matters left to the jury. Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1355 (Miss.1990).
¶ 25. Having found that Dr. Holzhauer was qualified to provide expert opinion via affidavit, we must now examine the content of the affidavit he produced. In addressing the content of Dr. Holzhauer's affidavit, NMMC argues that it fails to contain the required degree of specificity. NMMC also argues that Dr. Holzhauer's affidavit does not make any specific reference to the applicable standard of care, breach, and causation. Having reviewed Dr. Holzhauer's affidavit, we find these arguments to lack merit, because Dr. Holzhauer's affidavit very clearly refers to a standard of care or duty, breach of that duty, and the injury (death) caused by that breach. Although the affidavit does not employ the particular terms of art "breach, causation," and the like, those elements are most definitely present in the affidavit, and we have held that a failure to use the terms of art does not render an expert's affidavit deficient. Paepke v. North Mississippi Medical Center, Inc., 744 So.2d 809, 812 (¶ 12) (Miss.Ct. App.1999).
*932 ¶ 26. In this regard, we will consider some of the specific language from Dr. Holzhauer's affidavit. For instance, the affidavit declares, "The standard of care of a physician for a hospitalized patient is to provide continuous care. . . . The nursing staff of the hospital has a duty in the event of an emergency or a change in the condition to promptly notify the patient's physician or the physician taking call for the patient's condition. Upon failure of either of the above to respond, the hospital has a duty to provide physician care on an emergency basis as needed." (emphasis added) In light of these statements, we find NMMC's assertion that Dr. Holzhauer's affidavit fails to specifically mention duty or standard of care to be plainly meritless.
¶ 27. We also note several other statements that appear in the affidavit as well: "The nursing staff clearly should have notified the covering physician on the afternoon of December 30, 1999 of her symptoms and conditions and should have done whatever was necessary to secure the prompt personal attention to her by a competent physician. . . . Failure to . . . make an adequate response to what was clearly a life-threatening situation was a departure from the applicable standard of care. . . . Sepsis is a life-threatening infection. That early diagnosis, response and treatment is essential to deal with a sepsis infection. Any appreciable delay greatly decreases the chance of survival. Mrs. Partin began exhibiting symptoms of Sepsis infection during the afternoon of December 30, 1999." (emphasis added)
¶ 28. While, admittedly, we do not see the specific terms "breach" and "causation" used in the language of the affidavit, we do see the specific terms "standard of care" and "duty," and we most definitely see the meaning or import of all of those terms expressed in the language of the affidavit. To paraphrase what we quoted above, Dr. Holzhauer's affidavit declared: (1) that the hospital nursing staff had a duty to promptly notify the covering physician of a change in Mrs. Partin's condition; (2) that Mrs. Partin's symptoms of a sepsis infection began on the afternoon of December 30, 1999; (3) that the hospital nursing staff failed to promptly notify the covering physician on the afternoon of December 30, 1999 (this failure is not only implicit in the use of the phrase "should have promptly notified," but it is also uncontradicted by NMMC in the record); and (4) that because the infection was not dealt with early enough, it led to Mrs. Partin's death. In light of this, we find that Dr. Holzhauer's affidavit did, and that quite plainly, opine as to (1) the standard of care of the hospital nursing staff, (2) the breach of that standard of care, and (3) a causal connection between the breach and the injury or death. We do not here find that the statements in Dr. Holzhauer's affidavit are, in fact, correct; rather, we simply note that the affidavit does speak to all of the elements required for establishing genuine issues of material fact for a jury to decide in this case.
¶ 29. We also find that NMMC has incorrectly urged this Court, as it did the trial court, to view Dr. Holzhauer's affidavit in a negative light. As noted above, in considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the party against whom the motion is made. Williamson, 786 So.2d at 393 (¶ 10). In following NMMC's argument, it asks this court to draw numerous negative inferences and conclusions based upon alleged deficiencies in the form of the affidavit; but to do so would go against the standard of review of summary judgment motions, which requires us to draw inferences in favor of the non-moving party. Dailey, 790 So.2d at 915(¶ 15).
*933 ¶ 30. In this regard, we note another aspect of our law on summary judgment: motions for summary judgment should be viewed with a skeptical eye, and in questionable cases, the trial court should deny the motion. Dailey, 790 So.2d at 907 (¶ 3); Burkes v. Fred's Stores of Tennessee, Inc., 768 So.2d 325, 328(¶ 7) (Miss.Ct.App.2000). All the non-moving party need do in order to defeat a motion for summary judgment is to establish a genuine issue of material fact. Dailey, 790 So.2d at 918(¶ 23). Contrary to NMMC's assertions, the non-moving party does not have to prove all of the elements of its case in order to survive a pre-trial, summary judgment motion; rather, the non-moving party only has to demonstrate that there are genuine issues of material fact. Id.
¶ 31. In light of this, summary judgment was not proper as to NMMC, because there are triable issues of fact. In its arguments, NMMC has apparently confused the burden Partin faces at trial with the burden Partin faces on a motion for summary judgment. We find that Partin has demonstrated genuine issues of material fact that should have precluded summary judgment in favor of NMMC.
¶ 32. Moreover, we note that, in any event, we are not fully convinced from the record that an expert would be required to demonstrate the negligence of NMMC in this case. The record reflects that the hospital failed or refused to contact the on-call doctor for roughly twenty hours, while Mrs. Partin's condition gradually and visibly worsened and while her family continued to plead with the hospital to contact the on-call doctor. By way of explanation (or lack thereof) for this twenty hour delay in contacting Dr. Gray, the hospital responds with the bald assertion that Partin put on nothing that would establish a fact issue. NMMC, indeed, appears to studiously avoid dealing with the actual facts of what happened to Mrs. Partin, relying instead upon alleged deficiencies in Partin's expert witness affidavit. Thus, not to be overly polemical, but given the fact that NMMC does not dispute or attempt to rebut any of the factual allegations Partin makes and supports by expert affidavit, relying instead upon supposed technical defects in Partin's expert witness, summary judgment might just as well have been granted to Partin on the record before us. Our point in saying that, however, is not to suggest that summary judgment should, in fact, have been granted to Partin; we note this simply to illustrate the fact that summary judgment was certainly not proper for NMMC at this point in the case.
¶ 33. Ultimately, the record makes it clear that the trial court did not give Partin the benefit of the doubt, as required under our case law interpreting M.R.C.P. 56, and in many ways, the trial court placed an inappropriately high burden on Partin in order to survive NMMC's motion for summary judgment. Dr. Holzhauer's affidavit was sufficient to create a fact issue on the claim against NMMC, and, in any event, the record before us does not exclude the possibility of the layman's exception to the expert witness rule being applicable to the claim against NMMC. Therefore, we reverse the circuit court's judgment granting NMMC's motion for summary judgment and remand to the circuit court for a trial on the merits of Partin's claim against NMMC.

Dr. Oakes
¶ 34. Partin argues that the trial court committed reversible error in ruling upon Dr. Oakes's motion, because the motion was not filed at least ten days before the hearing, and Partin also maintains that no hearing was ever set for Dr. Oakes's motion. Thus, Partin argues that the trial court could not have ruled on Dr. Oakes's *934 motion on the basis of the hearing on the other appellees' motions. Dr. Oakes argues that the amendment to Rule 78 of the Mississippi Rules of Civil Procedure allows the trial judge to rule on a motion for summary judgment without a hearing. On the merits of the summary judgment issue, Dr. Oakes makes essentially the same arguments as NMMC; however, we will not address the merits of Dr. Oakes's arguments regarding summary judgment, because we find that the trial court committed a reversible procedural error in granting Dr. Oakes's motion for summary judgment. This is so because proper notice had not been given for Dr. Oakes's motion and a hearing had not been set and noticed as required by Rule 56 of the Mississippi Rules of Civil Procedure.
¶ 35. Dr. Oakes treated Mrs. Partin for a mild stroke. His care and treatment of Mrs. Partin ended on December 23, 1999, after which Mrs. Partin was transferred to the rehabilitation unit and to the care of Dr. Sharp. Dr. Oakes filed his motion for summary judgment on March 24, 2003, four days before the hearing was scheduled for the other appellees' summary judgment motions, which had been filed some months previous. At the hearing on March 28, 2003, Dr. Oakes's counsel declared that his motion was not yet ripe for consideration; nonetheless, the trial judge ruled on Dr. Oakes's motion along with all the other motions.
¶ 36. After reviewing the record, we agree with Partin's argument, and we find that Dr. Oakes has misunderstood M.R.C.P. 78. Dr. Oakes's argument appears to suggest that a trial judge can rule on any motion with or without a hearing, with or without any response from the opposing attorney, at any time, pursuant to M.R.C.P. 78. We do not find Rule 78 or our case law to support this argument. M.R.C.P. 78 reads as follows:
Each court shall establish procedures for the prompt dispatch of business, at which motions requiring notice and hearing may be heard and disposed of; but the judge at any time or place and on such notice, if any, as he considers reasonable may make orders for the advancement, conduct, and hearing of actions.
To expedite its business, the court may make provision by rule or order for the submission and determination of motions without oral hearing upon brief written statements of reasons in support and opposition.
¶ 37. Thus, M.R.C.P. 78 declares that courts may establish local rules allowing for certain motions to be decided on written briefs without a hearing, but M.R.C.P. 78 does not, by its terms, fundamentally change the requirements of M.R.C.P. 56 regarding summary judgment. Moreover, our case law on this subject clearly says that the notice and hearing requirements of Rule 56 are to be strictly enforced. For instance, the case of Hurst v. Southwest Miss. Legal Serv. Corp., 610 So.2d 374, 385 (Miss.1992) (overruled as to one particular aspect of its holding not related to Rule 56), declares that the ten day notice requirement for a summary judgment hearing is to be strictly enforced; thus granting a summary judgment motion on less than ten days notice can be reversible error.
¶ 38. However, the cases of Croke v. Southgate Sewer Dist., 857 So.2d 774, 778(¶ 10) (Miss.2003), and Adams v. Cinemark USA, Inc., 831 So.2d 1156, 1163(¶ 26) (Miss.2002), declare that the error in granting a summary judgment motion without a hearing may be harmless error if there are, indeed, no triable issues of fact. Adams, specifically, declared that a summary judgment motion may be decided upon written briefs, if it appears that there *935 are no genuine issues of material fact. Id. at 778(¶ 12). Thus, while our law in general requires adherence to the notice and hearing requirements of M.R.C.P. 56 and while our case law declares that granting a summary judgment motion without a hearing is error, we have made some allowance for harmless error in cases in which there are clearly no genuine issues of material fact.
¶ 39. In the case sub judice, the record shows that there was nothing substantive put on by Dr. Oakes or by Partin respecting Dr. Oakes's particular role in the case. This is because, as Dr. Oakes's counsel openly declared at trial, his motion for summary judgment was not yet ripe, being filed only four days before the hearing on the other parties' motions. In addition, Partin, not expecting to be dealing with Dr. Oakes's motion until a later date, did not prepare or deliver any specific response to Dr. Oakes at the March 28, 2003 hearing.
¶ 40. Based upon the foregoing we find that the trial court erred in granting Dr. Oakes's motion for summary judgment without the proper ten days notice and without a hearing, pursuant to M.R.C.P. 56. Regarding the holdings of Adams and Croke, we cannot say that the granting of summary judgment to Dr. Oakes was harmless error, because the record does not contain enough information regarding the claim against Dr. Oakes to say with certainty that there is no issue of fact regarding Dr. Oakes. Thus, we reverse the granting of summary judgment to Dr. Oakes and remand for a new hearing in which the proper procedure under Rule 56 is followed.

Dr. Sharp
¶ 41. Dr. Sharp makes a similar argument as NMMC, stating that Partin failed to put on probative evidence, by expert medical testimony, of the three necessary elements of a medical malpractice claim. Unlike our conclusion regarding NMMC, we find this argument, when advanced by Dr. Sharp, to have merit. This is because of Dr. Sharp's peculiar role in the case, and because Dr. Holzhauer's affidavit does not speak to Dr. Sharp's conduct in this matter.
¶ 42. Dr. Sharp was Mrs. Partin's treating physician beginning on December 24, 1999. On the morning of December 30, 1999, after seeing Mrs. Partin one last time, Dr. Sharp went out of town for the holidays. Dr. Sharp informed the family that he was leaving and that Dr. Gray would be on call in his place, should anything arise while he was out of town. It is undisputed that Dr. Sharp was off-duty and off-call during the entire time relevant to this action. That is, it is undisputed that Mrs. Partin's problems did not surface until after Dr. Sharp had left the hospital to go out of town, leaving Dr. Gray in charge of Mrs. Partin's care.
¶ 43. Based upon the fact that Dr. Sharp was not in the hospital and possibly not even in town, it seems that summary judgment was proper as to Dr. Sharp. Partin does not allege that it was somehow negligent for Dr. Sharp to go on vacation; thus, the fact that Dr. Sharp was not present (and not expected or required to be present, since he was away on vacation) at the times relevant to this action seems to exonerate him from any liability in Mrs. Partin's death. In response to this conclusion (that Dr. Sharp should not be held liable for something that happened while he was on vacation), Partin argues that a treating physician has a non-delegable duty to his patients and that, therefore, Dr. Sharp may be held vicariously liable for the negligence of Dr. Gray.
¶ 44. Dr. Sharp argues that Partin's contention is unsupported by any authority *936 and should, therefore, not be considered by this Court. In the alternative, Dr. Sharp argues that off-call doctors should not be held vicariously liable for the negligence of on-call doctors; in other words, Dr. Sharp argues that it does not make sense to hold him liable for something another doctor may have done while Dr. Sharp was out of town.
¶ 45. We agree with Dr. Sharp and find that Partin has failed to cite to any authority in support of this argument. On that basis alone, we could decline to consider the argument. United Plumbing and Heating Co., v. Mosley, 835 So.2d 88, 92(¶ 8) (Miss.Ct.App.2002). However, notwithstanding this procedural bar to Partin's argument, we will briefly consider the merits of the argument.
¶ 46. We recognize that our law places a non-delegable duty upon physicians in the care and treatment of their patients. Hall, 466 So.2d at 871 (superseded by statute as to a particular aspect of the holding not related to a physician's non-delegable duty); Dailey, 790 So.2d at 915(¶ 15). However, we do not believe that this non-delegable duty should be understood to create vicarious liability for a doctor who is off-duty, off-call, and out of town at the time that an on-duty, on-call doctor commits malpractice. Such an understanding of the idea of "non-delegable duty" would have extremely negative policy implications. As Dr. Sharp correctly notes, doctors need to go on vacation, just like everyone else, and it would be preferable if doctors could go on vacation without the threat of vicarious liability for negligent acts committed by other doctors in their absence. This principle is too obvious to warrant further discussion; thus, we reject Partin's argument that a physician's non-delegable duty, by itself, imposes vicarious liability on an off-call doctor for the malpractice of the on-call doctor serving in his or her place. An off-call doctor may, of course, be directly liable for his own negligence, if his leaving to go off-call (or leaving for vacation) at the particular time was itself negligent or if his choice of on-call doctor was negligent. But neither of those things are argued by Partin, nor are either of those things present in the case sub judice.
¶ 47. We hasten to add that we do not here hold that an off-call doctor may never, under any circumstances, be held vicariously liable for the negligence of an on-call doctor; that is a question that we decline to address here. We simply find Partin's argument, namely that the non-delegable duty by itself creates such vicarious liability, to lack merit. In addition, we note that Dr. Holzhauer's affidavit contradicts Partin's argument on this point in that it says, "If the physician is unable to provide such care personally for any period of time, both the hospital and the physician must ensure adequate coverage by a competent physician." Thus, the affidavit of Partin's medical expert does not bear out Partin's vicarious liability theory, because the affidavit declares a physician's duty to be met when the physician "ensure[s] adequate coverage by a competent physician." This was most certainly done in this case by Dr. Sharp leaving Dr. Gray, a competent physician, on-call.
¶ 48. We find that summary judgment was not improperly granted to Dr. Sharp, because (a) he was not on-duty, on-call, or even in town at that time relevant to this action, (b) he left another, well qualified on-call doctor in his place, and (c) there is no indication that Dr. Sharp's leaving for vacation when he did was somehow negligent; that is, Dr. Sharp left when Mrs. Partin's condition was still normal.
*937 ¶ 49. We note that a similar circumstance was present in Mallery v. Taylor, 805 So.2d 613, 619-20 (¶ 7-8) (Miss.Ct.App. 2002). In Mallery, one of the defendants, a doctor, was on vacation when the plaintiff was allegedly injured, and, because of that fact, the doctor's motion for summary judgment was granted. Id. Although the Mallery case did not specifically discuss the issue, instead simply noting that the doctor was dismissed, we think the same action was proper in the case sub judice, as it was in the Mallery case.
¶ 50. Therefore, based upon the foregoing discussion we affirm the grant of summary judgment to Dr. Sharp.

Dr. Gray
¶ 51. Dr. Gray's argument is similar to the arguments of the others, namely, that Partin failed to establish, by medical expert testimony, the standard of care, breach, and causation. Partin argues that there was a fact issue at least as to whether Dr. Gray should have responded in person to the call she received from the hospital.
¶ 52. Dr. Gray was the on-call doctor who was filling in for Dr. Sharp. The undisputed facts in the record indicate that Dr. Gray promptly responded by phone when she was actually called on December 31, 1999. The first time she was called was at around 6:30 a.m. on December 31, 1999, and at this time she ordered some medications to be administered to Mrs. Partin. She was called a second time roughly forty minutes after the first call, and at this time she instructed the nurses to get the internist in the hospital to see to Mrs. Partin immediately. By that time, however, it was too late. But, it is undisputed that Dr. Gray responded promptly, although not in person, but by phone, when she was actually notified of Mrs. Partin's condition.
¶ 53. We find Dr. Gray's argument to be persuasive, because the affidavit of Dr. Holzhauer does not speak directly to Dr. Gray's conduct. The closest Dr. Holzhauer's affidavit comes to implicating Dr. Gray is when it declares, "Generally, as a rule of thumb, a physician should be available with[in] 30 minutes from the time notified." We find this statement, by itself, to be far too broad to establish a fact issue as to Dr. Gray. This statement hints at the standard of care that Dr. Gray was to observe, but it does not speak to breach or causation in the specific claim against Dr. Gray. In addition, we find in the record evidence that a physician, Dr. Hill, personally responded to Mrs. Partin within roughly fifty minutes to an hour of the time that Dr. Gray was first contacted.
¶ 54. While Dr. Gray's order to get an internist to personally see to Mrs. Partin may have been late by twenty to thirty minutes (assuming, for the sake of argument, the thirty minute duty stated in Dr. Holzhauer's affidavit to be correct and assuming a breach of that duty), there is nothing in the record to suggest that an inperson response by Dr. Gray within thirty minutes would have changed Mrs. Partin's fate. Thus, even accepting Dr. Holzhauer's affidavit as true, it creates no fact issue as to causation. When Dr. Hill arrived, Mrs. Partin's condition was irreversible, and while the record does bear out a possible fact issue as to whether the hospital's twenty hour delay in contacting the on-call doctor caused the death of Mrs. Partin, the record does not bear out a fact issue as to whether Dr. Gray's twenty minute delay in ordering an in-person evaluation by Dr. Hill caused the death of Mrs. Partin. The record does not give any indication that the absence of a twenty or thirty minute delay on the part of Dr. Gray would have made any difference after the twenty-plus hour delay on the part of the hospital. On the contrary, the record *938 before us, which includes Dr. Holzhauer's affidavit, gives no reason to believe that Dr. Gray, had she responded in person within thirty minutes, would have found Mrs. Partin in any other condition than the one in which Dr. Hill found her.
¶ 55. Therefore, because Dr. Holzhauer's affidavit, even if accepted as true, does not create a genuine issue of material fact on the issues of breach and, especially, causation as to the claim against Dr. Gray, we affirm the granting of summary judgment to Dr. Gray.

II. DID THE TRIAL COURT ERR IN DENYING PLAINTIFF'S MOTION FOR DISCOVERY CONFERENCE AND/OR PRE-TRIAL CONFERENCE AND FOR STAY OF MOTIONS FOR SUMMARY JUDGMENT?
¶ 56. Partin argues that the motions for summary judgment should not have been heard until after more meaningful discovery had been conducted between the parties. Partin also argues that the court should have granted his motion for discovery conference, in light of the continuing difficulty he was having in scheduling matters with the attorneys for the appellees. The appellees argue generally that Partin has waived his argument about needing further discovery through his failure to conduct any discovery prior to the filing of the motions for summary judgment. The appellees also argue that Partin has failed to make the requisite showing as to why he could not properly respond to the summary judgment motions without the benefit of further discovery.

STANDARD OF REVIEW
¶ 57. Our standard of review of a trial court's management of the pre-trial discovery process is abuse of discretion. Bowie v. Montfort Jones Memorial Hospital, 861 So.2d 1037, 1042(¶ 14) (Miss.2003).

DISCUSSION
¶ 58. The case of Hobgood v. Koch Pipeline Southeast, Inc., 769 So.2d 838 (Miss.Ct.App.2000), contains a helpful analysis of an issue very similar to the one here raised by Partin. In Hobgood, responding to the argument that the plaintiff was not allowed enough time to properly develop the facts before facing a summary judgment motion, the court said:
A party may defend against summary judgment by presenting affidavits that prove "that he cannot for reasons stated present by affidavit facts essential to justify his opposition"; the result of such proof is that the trial court should continue the case to allow discovery to develop further. M.R.C.P. 56(f). The record shows that Hobgood propounded no discovery during the three months between the filing of the complaint and the hearing on summary judgment. The need for additional time as allowed under this rule is not proven merely through allegation:
However, the party resisting summary judgment must present specific facts why he cannot oppose the motion and must specifically demonstrate "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." United States v. Little Al, 712 F.2d 133, 135 (5th Cir.1983).

Marx v. Truck Renting and Leasing Association, Inc., 520 So.2d 1333, 1343-44 (Miss.1987). This exception in Rule 56 may not be used to avoid diligence in pursuing formal discovery; "normally the party invoking Rule 56(f) must show what steps have been taken to obtain access to the information allegedly within the exclusive possession of the other party." Id. at 1344. No such showing was even attempted, much less made. *939 In Marx, five months passed without the defendant's attempting any discovery. Id. In this case, Hobgood never sought any discovery, not after filing his answer nor after being served with the summary judgment motion.
Hobgood, 769 So.2d at 845 (¶ 35).
¶ 59. A very similar situation is present in the case sub judice. Here, Partin did not make any written discovery requests until after the motions for summary judgment had already been filed, and there were roughly six to eight months in which written discovery requests might have been propounded. Roughly one month after the filing of the motions for summary judgment, Partin propounded interrogatories and requests for production of documents to the separate defendants. Partin also shortly thereafter attempted to schedule depositions; however, at this time all parties agreed to await conducting any further discovery and to postpone any depositions until after the summary judgment motions had been decided.
¶ 60. Thus, Partin was in something of a difficult position: he needed to conduct discovery in order to develop his evidence to survive the motions for summary judgment, but the appellees urged the postponement of discovery until after the motions for summary judgment were decided. One of the appellees threatened to file a motion for a protective order to prevent discovery, in the event that Partin insisted on going ahead with discovery while the summary judgment motions were pending and undecided. Why Partin did not insist upon the continuance of discovery for the purpose of building his evidence against the summary judgment motions, we cannot say; nor can we say what the result would have been had Partin made this choice and opposed any motions for protective orders or filed for himself motions to compel discovery. However, it is apparent that Partin was not diligent in conducting discovery before the filing of the motions for summary judgment. There were at least five to six months during which Partin could have exercised this required diligence. Under the holding of Hobgood (which found a mere three month failure to pursue discovery to undermine the plaintiff's argument that more discovery was needed) this failure to pursue discovery renders Partin's argument on this issue meritless. Hobgood, 769 So.2d at 845(¶ 35).
¶ 61. Thus, we find no abuse of discretion in the circuit court's decision to deny Partin's motion to stay consideration of the motions for summary judgment filed by the appellees. We decline to address the question of whether the trial court should have ordered a discovery conference, since the trial court did not address that question specifically, due to its ruling on the motions for summary judgment. Further discovery with the remaining defendants will doubtless be attempted on remand, and if Partin continues to have the problems he has alleged, then a discovery conference and scheduling order may very well be necessary at that time. But this Court has neither the prerogative nor the inclination to mire itself in the details of managing the pre-trial discovery process, which is properly left to the discretion of the trial court. Bowie, 861 So.2d at 1042(¶ 14).
¶ 62. Without deciding the question of whether a discovery conference and scheduling order may become necessary at some point in this case, we find Partin's arguments under this issue to be meritless.
¶ 63. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS AFFIRMED IN PART AS TO THE GRANTING OF SUMMARY JUDGMENT TO DR. RICHARD SHARP AND DR. LAURA GRAY AND AS TO THE *940 DENIAL OF THE MOTION FOR DISCOVERY CONFERENCE AND/OR PRETRIAL CONFERENCE AND FOR STAY OF MOTIONS FOR SUMMARY JUDGMENT. THE JUDGMENT IS REVERSED AS TO THE GRANTING OF SUMMARY JUDGMENT TO NORTH MISSISSIPPI MEDICAL CENTER AND DR. THOMAS OAKES AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEES.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, CHANDLER, GRIFFIS, AND ISHEE, JJ. CONCUR. BARNES, J., NOT PARTICIPATING.