991 So.2d 615 (2008)
Matthew SACKS, M.D., and The Medical Oncology Group, P.A., Appellants
v.
Nancy NECAISE, Individually and on Behalf of the Wrongful Death Beneficiaries of Charles Freeman, Deceased Appellee.
No. 2006-CA-01068-COA.
Court of Appeals of Mississippi.
December 11, 2007.
Rehearing Denied April 15, 2008.
Certiorari Granted July 17, 2008.
Certiorari Dismissed as Improvidently Granted September 25, 2008.
*618 Thomas L. Musselman, Stacie Elizabeth Zorn, Pascagoula, attorneys for appellants.
Robert W. Smith, Biloxi, attorney for appellee.
EN BANC.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. Charles Freeman was diagnosed with lung cancer in early 1998. At the time of his diagnosis, Freeman also suffered from diabetes, chronic obstructive pulmonary disease, atherosclerotic vascular disease, and mild organic brain syndrome. Freeman began chemotherapy treatment by intravenous (IV) therapy on January 22, 1998, at The Medical Oncology Group, P.A. (MOG) in Gulfport, Mississippi under the supervision of Dr. Matthew Sacks.
¶ 2. Freeman's cancer was treated with Taxol, a highly toxic drug used in battling systemic cancer. His first treatment was relatively uneventful. On February 12, 1998, MOG's staff administered a second treatment. During this treatment, Freeman experienced pain, swelling, and discoloration to the arm that was being infused. Over the next several days, the skin on his arm began to peel off and the area became swollen to two or three times its normal size. The damage was characterized as a third degree chemical burn.
¶ 3. On August 19, 1998, Freeman filed a complaint in the Circuit Court of Hancock County alleging medical malpractice against Dr. Sacks and MOG. Freeman asserted in his complaint that MOG's staff and Dr. Sacks, through vicarious liability, were negligent in the administration of the chemotherapy agents. Dr. Sacks and MOG argued in response that Freeman's injuries were the result of an adverse drug reaction and not negligence on their part. Freeman died in January 1999 from causes unrelated to the arm injury, and his daughter, Nancy Necaise, was substituted as plaintiff. After a bench trial, the trial court found Dr. Sacks and MOG liable for injuries Freeman sustained in their care. The trial court awarded Necaise $217,334.36.
¶ 4. Dr. Sacks and MOG now appeal the decision of the trial court asserting the following issues: (1) the trial court erred when it ruled that Necaise met her burden of proof on all the elements of medical negligence, (2) the trial court erred when it denied Dr. Sacks's Daubert motion, (3) the trial court erred when it allowed Necaise's nursing expert to testify on issues of medical diagnosis and treatment outside the practice of nursing, (4) the trial court erred when it imputed vicarious liability to Dr. Sacks, (5) the trial court erred when it allowed Necaise to submit medical bills for treatment of pre-existing conditions unrelated to the claims in this matter, and (6) the judgment was based on clearly erroneous findings which are not supported by the record.
¶ 5. Finding no error, we affirm.

*619 STANDARD OF REVIEW
¶ 6. In reviewing the decision of a trial judge sitting without a jury, this Court may only reverse when the findings of the trial judge are manifestly wrong or clearly erroneous. Singley v. Smith, 844 So.2d 448, 451(¶ 9) (Miss.2003). A circuit judge sitting without a jury is accorded the same deference as a chancellor, his or her findings will not be overturned if supported by substantial evidence. Id. Additionally, when sitting as the finder of fact, the trial judge has the sole authority for determining the credibility of witnesses. Yarbrough v. Camphor, 645 So.2d 867, 870 (Miss.1994).

DISCUSSION

I. DID THE TRIAL COURT ERR IN FINDING THAT NECAISE MET HER BURDEN OF PROOF ON THE ELEMENTS OF MEDICAL NEGLIGENCE?
¶ 7. Dr. Sacks and MOG argue that Necaise failed to show the requisite standard of care applicable to Dr. Sacks through the testimony of a qualified medical expert and, thus, failed to prove all the elements of medical negligence.
¶ 8. To prevail on a claim of medical negligence, the plaintiff bears the burden of proof and must show the following four elements of negligence by a preponderance of the evidence: (1) the defendant had a duty to act in accordance with a standard of reasonable care so as to prevent injury to a foreseeable plaintiff; (2) the defendant failed to conform to the appropriate standard of care; (3) this breach proximately caused his injury; and (4) that he suffered actual harm or injury as a result of the defendant's negligent conduct. Lander v. Singing River Hosp. Sys., 933 So.2d 1043, 1046(¶ 10) (Miss.Ct. App.2006).

1. Reasonable standard of care
¶ 9. Dr. Sacks argues that the standard of care for the care of a chemotherapy patient by a doctor should have been articulated through the testimony of a medical doctor rather than a nurse. However, the issue in this case was not negligence on the part of Dr. Sacks but rather the negligence of MOG's staff. Nurse Jean Byrd, under the supervision of Dr. Sacks, administered the chemotherapy to Freeman on February 12. Dr. Sacks had a non-delegable duty to his patient to assure the medication he ordered was properly administered. Partin v. N. Miss. Med. Ctr., Inc., 929 So.2d 924, 936(¶ 46) (Miss.Ct.App.2005). If a doctor chooses to allow a nurse to perform a non-delegable duty, the doctor must accept responsibility if that duty is breached. Id. The trial court found Dr. Sacks vicariously liable for nursing neglect and, thus, there was no need to establish the standard of care for a medical doctor.
¶ 10. As for the requisite standard of nursing care, all the experts agreed that the appropriate standard of nursing care requires a drug to be immediately discontinued upon discovery of swelling, pain, and/or a change in skin color.

2. Failure to conform to the applicable standard of care
¶ 11. Pamela Jenner, a registered nurse with experience in administering chemotherapy, testified for Necaise. Jenner testified that Nurse Byrd did not conform to the applicable standard of care. Dr. Sacks and MOG argue that Jenner's testimony was unreliable and should have been excluded because it was based on unreliable assumptions and speculation.
¶ 12. Conflicting testimony was presented regarding how long the Taxol *620 was administered and how often Freeman was monitored. The trial judge found credible Freeman's brother's testimony that he vehemently warned Nurse Byrd that Freeman's arm was becoming swollen approximately forty-five minutes after the IV was started. Dr. Sacks and MOG take issue with Jenner's reliance on Freeman's brother's testimony because it contradicted the testimony of Nurse Byrd, Dr. Sacks, and Joanne Pearson, another nurse present at MOG on February 12. According to Nurse Byrd, the full amount of Taxol was administered over the course of three hours. Taking this testimony as true, Nurse Byrd allowed the Taxol to continue to be administered for a little over two hours after she was warned of the swelling. This was an obvious breach of the standard of care which requires a drug to be immediately discontinued upon the discovery of pain and swelling. While Nurse Byrd testified that she did not notice the swelling until after the Taxol was completely administered, the trial judge chose not to accept this testimony. The record is unclear whether Freeman was even monitored after the first hour. Nurse Byrd testified that she checked on him every fifteen minutes but did not document it in his medical records. At most, the record shows that Nurse Byrd could see him from a nursing station across the hall. We find that the above evidence is sufficient to show a deviation from the standard of care.
¶ 13. Dr. Sacks and MOG next argue that the trial court should have relied on the testimony of their nursing expert, Annette Dove, in determining whether the standard of care was breached. They argue that Dove was more qualified than Jenner to testify because Dove was a certified oncology nurse and had personally administered the chemotherapy agents used on Freeman in his chemotherapy treatment. Jenner had never administered Taxol and had no experience with chemotherapy agents since around 1980. Dove's testimony was opposed to Jenner's testimony that successive administration of chemotherapy should be alternated between arms. Also, the nurses contradicted each other as to whether Freeman's vital signs were monitored and how often. However, when sitting as the finder of fact, the trial judge has the sole authority for determining the credibility of witnesses. Yarbrough, 645 So.2d at 870. We cannot find that the trial judge abused his discretion in relying on one expert over the other.

3. Proximate cause
¶ 14. As for proximate causation, Dr. Sacks admitted in his deposition that Taxol caused the injury through an infiltration and that resulted in Freeman developing cellulitis and skin breakdown which necessitated multiple hospital stays. Also, he dictated on multiple occasions for hospital records that Freeman "had an infiltration of Taxol." He also dictated that his impression of Freeman's arm was "[c]ellulitis from infiltration of Taxol." In the hospital discharge summary he dictated that "Mr. Freeman was admitted to ECU [Extended Care Unit] with a diagnosis of cellulitis involving the left upper extremity secondary to Taxol." In his testimony, Dr. Sacks agreed that it would be a breach of the nursing standard of care if the nurse continued to administer Taxol after being told that a patient's arm was swollen. In addition to his repeated admissions that infiltration occurred, Dr. Sacks told Freeman's family that he was responsible for the damage to Freeman's arm and to go ahead and do what they needed to do from a litigation standpoint. Despite the hospital records and deposition testimony admitting that an infiltration had occurred, Dr. Sacks testified at *621 trial that no infiltration occurred and that the injury was likely caused by a hypersensitive reaction.
¶ 15. Freeman was treated with Taxol four more times subsequent to the injury on February 12, 1998, with no adverse reaction. Dr. Michael Meshad, the defendants' medical expert, agreed with Dr. Sacks that the damage to Freeman's arm was possibly caused by a hypersensitive reaction. However, on cross-examination, Dr. Meshad acknowledged that he had never seen such damage from a hypersensitive reaction to Taxol and that there was no medical literature to support a theory that such a reaction could cause such extensive tissue damage as was present in this case. Jenner also testified that she could not find support for a theory that a hypersensitive reaction could result in complete tissue destruction. Jenner did, however, cite literature that listed Taxol as a vesicant which by definition could cause tissue damage if leaked outside the vein.
¶ 16. The trial court chose not to accept the testimony of Dr. Meshad and Dr. Sacks on the issue of causation. The trial court specifically found that Dr. Meshad's theory that a hypersensitive reaction caused the damage to Freeman's arm was unsubstantiated. The trial court did not abuse its discretion in dismissing testimony it found to be unsubstantiated.
¶ 17. We cannot find that the trial court abused its discretion in weighing the credibility of the witnesses to determine the cause of Freeman's injury. We find this sufficient to show that negligence in the administration of Taxol or monitoring thereafter was the proximate cause of Freeman's injury.

4. Actual harm
¶ 18. Finally, Dr. Sacks and MOG argue that even if Dr. Sacks breached the standard of care and proximately caused the alleged injury, Necaise failed to prove the actual harm or extent of damages that Freeman suffered. Necaise submitted bills from Freeman's hospital stays and photographs of the extensive damage he suffered to his arm. Necaise testified that her father was in continuous pain and needed help performing basic tasks.
¶ 19. We find that the trial court's finding of negligence was supported by the record and was not an abuse of discretion.

II. DID THE TRIAL COURT ERR IN DENYING THE DEFENDANTS' DAUBERT MOTION?
¶ 20. Necaise offered Pamela Jenner as an expert witness in the area of chemotherapy nursing. Dr. Sacks and MOG filed a motion to exclude Jenner's testimony. They argued that Jenner was not an expert in the field because she had not practiced nursing in twenty years, had never administered the chemotherapy agents administered to Freeman, was not an advanced oncology certified nurse, and had never been accepted by another court as an expert in the field of chemotherapy nursing. The trial court conducted a Daubert[1] hearing on Jenner's qualifications and found her to be qualified.
¶ 21. Jenner practiced nursing from 1975 to 1985. She testified that she administered chemotherapy to hundreds of *622 patients from 1975 to 1980 when she worked in a hospital's cancer unit. She continued to care for chemotherapy patients on occasion from 1980 to 1985 when she worked as a private duty nurse. She has been a practicing attorney since 1986.
¶ 22. Mississippi Rule of Evidence 702 states:
[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
This rule emphasizes that it is "the gate keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable." M.R.E. 702 cmt. In McLemore, the Mississippi Supreme Court adopted the federal court analysis for admission or exclusion of expert testimony and applied it to Rule 702. McLemore, 863 So.2d at 35-40 (¶¶ 6-25). The supreme court stated that "whether testimony is based on professional studies or personal experience, the `gatekeeper' must be certain that the expert exercises the same level of `intellectual rigor that characterizes the practice of an expert in the relevant field.'" Id. at 37-38(¶ 15) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).
¶ 23. Jenner had not been a practicing nurse in twenty years and was not a certified chemotherapy nurse. However, neither of these facts precluded her from testifying as to her knowledge on the subject. Jenner was a licensed nurse and was familiar with the current standards of chemotherapy administration. A physician who is sufficiently "familiar with the standards of [a medical] specialty, [may testify as an expert, even] though he [does] not practice the specialty himself." Cheeks v. Bio-Medical Applications, Inc., 908 So.2d 117, 120(¶ 8) (Miss.2005) (quoting West v. Sanders Clinic for Women, P.A., 661 So.2d 714, 718-19 (Miss.1995)). During her career, Jenner saw infiltrations and extravasations. She was not called to testify as to how the injury was caused or as to the effect of Taxol on a human body. She was called to testify whether the administration of the drugs was done properly. In the motion hearing, Necaise's attorney stated that any theory of causation would be left to the testimony of Dr. Sacks. The length of time from her experience until trial did not disqualify Jenner from testifying. In fact, the defendants' expert, Dove, testified that the standard of care for a nurse had not changed since 1977. Further, Jenner performed extensive research in preparing for trial.
¶ 24. The admission of expert testimony is within the sound discretion of the trial judge. Roberts v. Grafe Auto Co., 701 So.2d 1093, 1098 (Miss.1997). "[A]n abuse of discretion standard means the judge's decision will stand unless the discretion he used is found to be arbitrary and clearly erroneous." Poole v. Avara, 908 So.2d 716, 721(¶ 8) (Miss.2005). We cannot find that the trial judge abused his discretion in allowing Jenner to testify. In reaching this decision, it must be kept in mind in this case that most of the safeguards provided for in Daubert are not as essential where a judge sits as the trier of fact in place of a jury. Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir.2000).
¶ 25. We find Issue II to be without merit.

*623 III. DID THE TRIAL COURT ALLOW NECAISE'S NURSING EXPERT TO TESTIFY ON ISSUES OUTSIDE THE PRACTICE OF NURSING?
¶ 26. Dr. Sacks and MOG argue that Jenner should not have been allowed to testify as to the cause of Freeman's injury because such issues are outside a nurse's expertise and should be determined by a medical doctor.
¶ 27. Defense counsel objected when Jenner testified that she could not find support in medical literature for the theory that a hypersensitive reaction caused Freeman's injury. The court overruled this objection. The defense asked for and received a continuing objection arguing that Jenner was unqualified to testify as to causation. The plaintiff's attorney directed Jenner to an article that said Taxol infiltrations could lead to severe tissue necrosis or destruction of the tissues. The defendants objected again arguing that the plaintiff was trying to "backdoor" opinion testimony through internet research. The trial judge allowed Jenner to testify on causation based on her designation and the Daubert hearing. She was designated, among other areas, to testify to the following:
monitoring the patient for signs of Taxol extravasation, treatment of Taxol extravasation, and monitoring the patient for hypersensitive reactions to Taxol, the signs and symptoms of hypersensitive reactions, the signs and symptoms of IV infiltration, the medical literature dealing with hypersensitivity and extravasation, and the effects of Taxol extravasation and chemotherapy guidelines for oncology nursing.
¶ 28. A trial court's decision to allow expert testimony will be affirmed "[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case." Jones v. State, 918 So.2d 1220, 1223(¶ 9) (Miss.2005). We cannot find that the trial court abused its discretion in allowing Jenner to give an opinion on the validity of a hypersensitive reaction theory. Jenner based her opinion on fourteen medical journal articles which were submitted to the court and defendants. Her testimony was that "[h]ypersensitivity reaction has more to do with symptoms that you see right within the first 15 to 20 minutes of administration of the drugs." She also testified that, based on her research, Taxol has properties as a vesicant and irritant.[2] Based on Taxol's properties as a vesicant, Jenner stated that it had the potential to cause severe tissue destruction if it were to leak out of the vein and, thus, should be monitored continuously.
¶ 29. We cannot find that Jenner testified as to areas outside of her expertise. We find this issue to be without merit.

IV. DID THE TRIAL COURT ERR IN FINDING DR. SACKS VICARIOUSLY LIABLE FOR THE ACTS OF NURSE BYRD?
¶ 30. In Hunnicutt v. Wright, 986 F.2d 119, 124 (5th Cir.1993), the Fifth Circuit, applying Mississippi law, found that "the law imposes liability on a physician for the negligence of a nurse only if the nurse committed the negligent acts or omissions pursuant to the direction and control of the physician." See also Winters v. Wright, 869 So.2d 357, 367(¶ 24) *624 (Miss.2003) (adopting Hunnicutt). Dr. Sacks admitted that Nurse Byrd was under his direct supervision and control at the time Freeman was injured. Therefore, the trial court correctly concluded that Dr. Sacks was liable for any negligence that Byrd might have committed when she administered chemotherapy to Freeman.

V. DID THE TRIAL COURT USE UNRELATED MEDICAL BILLS WHEN CALCULATING DAMAGES?
¶ 31. Sacks and MOG argue that the trial court erroneously accepted Freeman's $42,334 in medical bills as evidence of damages when most of the bills were related to unrelated pre-existing conditions. Freeman incurred these medical bills during a hospital stay from February 18, 1998, to March 9, 1998. Freeman was initially admitted to the hospital on February 18 for shortness of breath and fever. He received treatment for cellulitis from February 24 until he was discharged on March 9. We find that the trial court clearly made a distinction between the applicable and non-applicable medical treatment in calculating damages.
¶ 32. In its ruling the trial court stated:
The damages here are substantial. Plaintiff introduced medical bills totaling $42,334.36. While it is arguable that some of the medical care while hospitalized was rendered due to Mr. Freeman's pre-existing condition of cancer, the vast majority of the treatment and need for three hospitalization was due to cellulitis and the overall condition of his arm.
Also, upon admitting the medical bills into evidence the trial court stated, "I'm going to admit them in evidence subject to reviewing them with the admission reports which may cause me to exclude portions of them." Further, at the close of trial, the judge stated, "as the trier of fact, I need to compare some of the medical records with the medical bills that were given to me, as I indicated earlier. . . ." These comments by the trial judge clearly indicate that the medical bills were carefully reviewed and only relevant bills were considered in the calculation of damages.
¶ 33. We find this issue to be without merit.

VI. WAS THE JUDGMENT SUPPORTED BY THE TESTIMONY OR EVIDENCE IN THE RECORD?
¶ 34. Dr. Sacks and MOG argue that the trial judge abused his discretion, was manifestly wrong, and used an erroneous legal standard in finding liability. Also, Dr. Sacks and MOG argue that the trial court relied on several erroneous findings of fact stated in his judgment.
¶ 35. We find the appellants' final contention without merit. The erroneous findings cited by Dr. Sacks and MOG in their brief were either supported by the record or were in dispute. As to the facts in dispute, it is the job of the trier of fact, in this case, the judge presiding over the bench trial, to weigh the witnesses' testimony. Lander, 933 So.2d at 1047(¶ 18). The trial judge did not abuse his discretion in weighing the testimony and basing his findings on the testimony he determined to be more credible. Further, even if an abuse of discretion is found, we will reverse only where the error adversely affects a substantial right of a party. Gibson v. Wright, 870 So.2d 1250, 1258(¶ 28) (Miss.Ct.App.2004). Dr. Sacks and MOG have not asserted that a substantial right has been affected.
¶ 36. After reviewing the testimony of the witnesses and seeing pictures of the severe damage to Freeman's arm, the negligence *625 in administering the Taxol is evident. Despite the defendants' argument that Jenner was not qualified to testify, no more extensive expert testimony or even a more qualified expert was necessary for the trial judge to reach a conclusion that the improper administration of Taxol caused the damage to Freeman's arm. It is undisputed that Freeman suffered immensely following the infiltration. His arm continued to swell and the skin died. He was hospitalized three times. As a chemotherapy patient, he was highly susceptible to infections which was only worsened by his arm which was basically an open wound. Freeman's daughter testified that for the next eleven months after the injury and before his death, the arm had to be continuously bandaged, the skin bled on contact with almost any object, and he was in continuous pain.
¶ 37. We cannot find that the trial judge abused his discretion or reached a clearly erroneous decision in finding that the acts of Nurse Byrd, Dr. Sacks, and MOG were negligent. The award by the trial court of personal injury damages in the amount of $217,334.36 is affirmed.
¶ 38. THE JUDGMENT OF THE CIRCUIT COURT OF HANCOCK COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., MYERS, P.J., IRVING AND CHANDLER, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BARNES, ISHEE, ROBERTS AND CARLTON, JJ.
GRIFFIS, J., Dissenting.
¶ 39. I must respectfully dissent to the majority's opinion. It is obvious under the facts of this case that Nurse Jenner was not qualified to testify to the standard of care, the breach of the standard of care, and causation. Therefore, the plaintiff did not put forward any evidence of duty, breach, or causation, and this court should reverse and render.
¶ 40. The majority correctly quotes Mississippi Rule of Evidence 702 and Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 35-40 (¶¶ 6-25) (Miss.2003). The majority also discuss the trial court's gatekeeping responsibility and gives great deference to the trial court's decision to not disregard Jenner's testimony. In doing so, the majority has eviscerated the trial court's gatekeeping responsibility and, in my opinion, diminished Daubert and Mississippi Rule of Evidence 702, which allows experts to testify if are they reliable, objective, and qualified.
¶ 41. After reviewing the record, Jenner was simply not qualified to testify. Jenner admitted that she has not administered chemotherapy since 1980. She has never administered Taxol, and she has never seen an infiltration that displayed symptoms like those of Freeman. During her deposition, she could not say whether Taxol is a vesicant or an irritant even though this is basic knowledge that an expert chemotherapy nurse should know. Further, she was not a certified chemotherapy nurse.
¶ 42. In an analogous case, the Mississippi Supreme Court upheld a trial court's refusal to accept a medical doctor as an expert. The court stated that:
Dr. Rawlings was not qualified to testify against Dr. McAuley. Dr. Rawlings was not board certified in otolaryngology or neuro-otolaryngology. . . . At the time of Troupe's surgery, Dr. Rawlings was not actively practicing medicine. Dr. Rawlings has no special training or experience in the field of otolaryngology or neurology. He had never conducted middle ear surgery, had never had privileges *626 at any hospital to conduct middle ear surgery, and was not qualified to conduct middle ear surgery.
Troupe v. McAuley, 955 So.2d 848, 857(¶ 24) (Miss.2007) (emphasis added). Like Dr. Rawlings, Nurse Jenner was unqualified to testify. She had not practiced in over twenty years. She abandoned her medical career to pursue a legal career. She had never administered the drugs involved in this case, and she was not a certified chemotherapy nurse.
¶ 43. Jenner's testimony also does not exhibit the level of intellectual rigor required under Daubert and Mississippi Rule of Evidence 702, because Jenner's statements are unreliable and not objective. In McLemore, the Mississippi Supreme Court stated,
the trial court must determine whether the proffered testimony is reliable. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the Daubert analysis is a flexible one. Daubert provides "an illustrative, but not an exhaustive, list of factors" that trial courts may use in assessing the reliability of expert testimony.

In applying the modified Daubert rule, Mississippi's federal courts have recognized that the gatekeeping role of federal trial courts is taken seriously. Moreover, there is universal agreement that the Daubert test has effectively tightened, not loosened, the allowance of expert testimony.

McLemore, 863 So.2d at 38 (¶¶ 16-17) (citations omitted) (emphasis added). Our supreme court has further emphasized, "whether testimony is based on professional studies or personal experience, the `gatekeeper' must be certain that the expert exercises the same level of `intellectual rigor that characterizes the practice of an expert in the relevant field.'" Id. at 37-38(¶ 15) (emphasis added) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Jenner's testimony did not exhibit the reliability and intellectual rigor required under Daubert.
¶ 44. Recently, the Mississippi Supreme Court reversed and remanded a custody determination by a chancellor because the chancellor based his ruling on unreliable expert testimony. Giannaris v. Giannaris, 960 So.2d 462, 471(¶ 17) (Miss.2007). The court found that the expert's "opinions were derived from unrecorded sessions with S.G. without independent verification of the truthfulness vel non of the allegations, and based upon her five week training and instincts." Id. at (¶ 16). The Fifth Circuit Court of Appeals has also addressed a similar situation. In Munoz v. Orr, 200 F.3d 291, 301 (5th Cir.2000), the court found an expert's opinion was unreliable because the expert "lacked the necessary objectivity to make his analysis credible."
¶ 45. Like the expert in Giannaris, many of Jenner's opinions were based on questionable or unreliable sources. During the trial, the defendants' attorney objected because he believed Jenner was trying to "back-door . . . opinion [testimony] by referring to an article that she found on the Internet." However, the trial court overruled this objection and let Jenner testify using her unreliable internet research instead of requiring the plaintiffs to produce an expert to discuss medical issues reserved for a doctor.
¶ 46. During her testimony, Jenner often presented contradictory statements and theories that further exhibit the unreliability of her testimony. First, Jenner testified that Taxol is a vesicant, but she had previously testified that she believed Taxol is an irritant. Second, she testified that Byrd breached the standard of care *627 for a nurse by disobeying Dr. Sacks's orders by administering all of the Taxol prescribed by Dr. Sacks in one hour instead of the three hours prescribed by Dr. Sacks. Then, she said that Byrd breached the standard of care because Pete Freeman informed Byrd that there had been an infiltration, but Byrd continued to administer Taxol for another two hours after this discovery. These two theories contradict each other and are impossible to reconcile. Also, Jenner's second theory shows, that despite discounting the majority of Byrd's testimony, Jenner still used portions of Byrd's testimony combined with Pete Freeman's testimony to speculate as to what occurred on the day in question. However, she chose to ignore Byrd's and Pete Freeman's testimony that Byrd removed the IV.
¶ 47. Jenner asserted several opinions that lacked factual or scientific support. Jenner testified that she believed it was a breach of the standard of care not to rotate the IV from one arm to the other arm from one chemotherapy treatment to the next. Jenner was unable, however, to say in what part of the arm the IV was inserted during each treatment, whether or not the nurses switched veins between treatments, and in what arm each treatment was given. Furthermore, she admitted that she did not do any research to confirm this unsubstantiated theory, which she created.
¶ 48. Jenner also testified that Byrd breached the standard of care by administering the full dosage of Taxol over an hour, which caused his injury. Yet, she made this assertion without knowing how much Taxol was actually given to Freeman. This testimony exhibits how unprepared and how unreliable Jenner was as an expert. One cannot say that Jenner's testimony exhibited reliability, scientific principles, or the level of intellectual rigor required of an expert in the field.
¶ 49. Jenner also made several other statements that show she lacked the objectivity required under Daubert. She testified that Byrd breached the standard of care because she did not keep Freeman under constant observation for the first hour. She agreed with defense counsel that Byrd testified that she observed Freeman from her desk the entire time, but Jenner said that this does not mean she observed the IV. She also said that even though Byrd took Freeman's vital signs every fifteen minutes that this does not mean she checked the IV. Jenner also said that the first vital signs charted in Byrd's records where not the baseline vital signs. Jenner lacked the objectivity required of an expert because she would not concede even the most common-sense points to the defense, which any reliable medical expert should concede.
¶ 50. A majority of Jenner's testimony was based on the belief that if it was not documented it did not happen. Thus, she discounted the testimony of Byrd and Pearson regarding the events of the day in question because this testimony was not recorded in the medical records. For example, Jenner did not believe Byrd's testimony that she found the infiltration or that Byrd disconnected the IV. Yet, she relied heavily of the Pete Freeman's testimony in forming her opinions because she "found his testimony more credible," even though she was not present when he testified. The supreme court has previously rejected the argument that if it is not documented it did not happen. The court stated that "[t]his argument lacks support in the law as well as the facts of this case." Lander v. Singing River Hosp. Sys., 933 So.2d 1043, 1046(¶ 14) (Miss.Ct.App.2006). Furthermore, this reliance on one version of the facts while ignoring another version *628 shows further that Jenner was not objective in her analysis.
¶ 51. In my opinion, Jenner's testimony was speculative at best. Her own opinions were contradictory, unreliable, and not based on sound science or facts. Her opinions also lacked objectivity because she relied totally on one version of the facts while completely disregarding the testimony of three other fact witnesses. Furthermore, she combined Pete Freeman's testimony with Byrd's testimony to create her own version of the facts when both of their stories were impossible to reconcile. The record does not reflect any showing that Jenner's "testimony was based, not on opinion or speculation, but rather on scientific methods and procedures." Edmonds v. State, 955 So.2d 787, 792(¶ 8) (Miss.2007).
¶ 52. If Necaise were able to prove duty and breach, she must still show that this deviation proximately caused Freeman's injury. Powell v. Methodist Health Care-Jackson Hosps., 856 So.2d 353, 357(¶ 13) (Miss.Ct.App.2003). The supreme court has previously held that a nurse cannot testify regarding complex issues of medical causation. Richardson v. Methodist Hosp. of Hattiesburg, Inc., 807 So.2d 1244, 1248(¶ 14) (2002) (holding that a nurse could not testify regarding the cause of a stroke, but the nurse could testify to the standard of care of a nurse). In Richardson, the plaintiff's only expert was a registered nurse. Id. The supreme court did not consider the registered nurse's testimony because the cause of a stroke is a complex medical issue. Id. at 1248(¶ 17). Instead, the court examined the testimony of Wheeless's doctor and found that it was not "supportive of Richardson's theory of wrongful death." Id.
¶ 53. Like Richardson, Necaise's only expert was a registered nurse. Prior to trial, Necaise expected to use the testimony of Dr. Sacks to prove causation because Dr. Sacks had previously said that Freeman's injury was caused by an infiltration. During trial, Dr. Sacks said that he was not certain what caused Freeman's injury. He stated that it could have been a hypersensitive reaction, an injection site reaction, or an infiltration. He also stated that administering the full dosage of Taxol for one hour as opposed to three hours could not have caused Freeman's injuries. "While no specific language, such as `with a reasonable degree of scientific certainty,' is required, an expert witness must still form his or her opinion with scientific certainty." Smith v. City of Gulfport, 949 So.2d 844, 850(¶ 19) (Miss.Ct.App.2007). After reviewing Dr. Sacks's testimony, I cannot say that any opinion Dr. Sacks espoused on the stand or in his deposition was formed with scientific certainty or is reliable under Daubert. Thus, the trial court abused its discretion by putting any reliance on his testimony regarding causation.
¶ 54. After Dr. Sacks's testimony, Jenner testified that she did not find any support in her medical literature research that supported Dr. Sacks's theory that Freeman's injuries were caused by a hypersensitive reaction. The defendants objected to this testimony of causation, but the trial court overruled this objection. Jenner made other statements regarding causation throughout her testimony. For example, Jenner theorized that a one-hour administration of 360 milligrams could have caused Freeman's injury. Like Nurse Keller in Richardson, Jenner was unqualified to testify to complex medical issues regarding causation. Thus, any weight that the trial court gave to her testimony regarding causation is an abuse of discretion.
¶ 55. In conclusion, I disagree with the majority and find Jenner's testimony in *629 this case to be unreliable and a clear violation of the mandates of Daubert. Jenner's testimony was contradictory and based upon the unreliable assumption that if something was not documented it did not happen. Also, she was unqualified to testify as to the standard of care for a chemotherapy nurse and the breach of that standard of care. Furthermore, Jenner was unqualified to testify regarding the cause and effect of Freeman's injury because this entails complex issues of medical causation. Therefore, Necaise has not put forward any evidence of standard of care, breach, or causation.
¶ 56. The majority would loosen the requirements on expert testimony simply because this is a bench trial and not a jury trial. I am of the opinion that the trial court erred in allowing Jenner to testify. Likewise, the trial court erred when it chose not to disregard Jenner's testimony and, instead, relied on her testimony in formulating the court's opinion. Recently, the Seventh Circuit, in In re Salem, 465 F.3d 767, 777 (7th Cir.2006) (emphasis added), in a very persuasive opinion, held:
It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same that is, the judge-the need to make such decisions prior to hearing the testimony is lessened. See United States v. Brown, 415 F.3d 1257, 1268-69 (11th Cir.2005). That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

¶ 57. Freeman was severely injured. However, the severity of one's injury should not diminish or eviscerate the requirement that expert testimony be reliable, objective, and trustworthy. Furthermore, this Court or any court will never be able to make a proper determination of whether or not Dr. Sacks or The Medical Oncology Group was negligent because the plaintiffs in this case have chosen to put forward the unreliable testimony of an unqualified expert instead of the testimony of a reliable medical expert.
¶ 58. I would reverse and render the trial court's judgment.
BARNES, ISHEE, ROBERTS AND CARLTON, JJ., JOIN THIS OPINION.
NOTES
[1] Factors used in a Daubert analysis include "whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community." Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 37 (¶ 13) (Miss.2003).
[2] A vesicant is a chemotherapeutic drug that has the propensity to cause local irritation should it extravasate outside of the vein into surrounding tissue. It is known for the property of tissue destruction. An irritant only causes redness and swelling.