# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01645-COA

**ESTATE OF SHERMAN WARD AND LINDY SPEIGHTS, INDIVIDUALLY AND ON BEHALF OF THE OTHER WRONGFUL DEATH BENEFICIARIES OF SHERMAN WARD**                    **APPELLANT**

v.

**CLIFTON WILLIAMS, M.D.**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/30/2019 |
| TRIAL JUDGE: | HON. MICHAEL M. TAYLOR |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT ALFORD LENOIR |
| ATTORNEYS FOR APPELLEE: | DAVID W. UPCHURCH |
| | JOHN MARK McINTOSH |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 04/27/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WILSON, P.J., GREENLEE AND WESTBROOKS, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.     On March 27, 2015, Sherman Ward died after requiring intubation with mechanical ventilation, vasopressor support, and continuous renal replacement therapy. Lindy Speights, as administratrix of the Estate of Sherman Ward and individually and on behalf of the other wrongful death beneficiaries (Speights), then filed a wrongful death action for medical negligence against Dr. Clifton Williams, the emergency room physician who administered the treatment to Ward at Southwest MS Regional Medical Center (SMRMC).  Following Speights's designation of Dr. Steven Weisbord, a nephrologist, as a medical expert, a motion

to exclude Dr. Weisbord's opinions was filed on the ground that he was not an expert with familiarity of Dr. Williams's professional specialty. The motion was granted. Summary judgment was then granted due to the lack of an expert opinion needed to establish a standard of care for medical negligence. Speights now appeals, alleging that the circuit court erred when granting summary judgment. Finding error, we reverse and remand.

**FACTUAL AND PROCEDURAL HISTORY**

¶2.     On January 15, 2015, Ward, a 68-year-old male with a history of hypertension, diabetes mellitus, and chronic kidney disease, underwent a colonoscopy for the removal of polyps. Dr. Joe Ward performed the procedure. Approximately three weeks following the colonoscopy, Ward developed pain in his rectum and sacral area as well as swelling in his right lower extremity. Blood testing was performed and demonstrated a serum creatinine concentration of 1.4 mg/dL, suggesting the presence of mild chronic impairment in kidney function.

¶3.     On February 4, 2015, Ward was seen by Dr. William Dixon, his general surgeon, for the aforementioned complaints. Dr. Dixon ordered a computer tomography (CT) scan with intravenous contrast to be performed at SMRMC. The CT scan revealed extensive inflammation in the right lower abdomen and pelvis, retroperitoneum mass-like enlargement and infiltration, and small pleura effusion. At the time, lab results did not indicate that Ward was in renal failure.

¶4.     On February 5, Dr. Dixon sent Ward to SMRMC's emergency room with worsening right lower extremity pain and swelling. There, Dr. Williams, the emergency room doctor,

2

treated Ward, who was afebrile with a normal blood pressure and an unremarkable abdominal examination. Lab testing demonstrated Ward's serum creatine concentration was 1.86 mg/dL. Dr. Williams obtained additional history of Ward's outpatient CT scan that Dr. Dixon ordered on February 4. Dr. Williams then ordered another CT scan be performed again at SMRMC. Notably, the second CT scan with contrast was ordered within twenty-four hours of the previous scan.

¶5. Ward complained of suffering several complications following the CT scan under the care of Dr. Williams. Ward was then transferred to St. Dominic's hospital for further care. During hospitalization, his serum creatinine concentration rose from 1.8 mg/dL on February 6 to 3.6 mg/dL on February 9, denoting the development of acute kidney injury. This acute kidney injury was attributed to contrast-induced nephropathy due to repeated intravascular contrast administrations prior to hospitalization.

¶6. Between February 9 and 13, Ward's serum creatinine concentration improved to 2.1 mg/dL, denoting incomplete recovery of acute kidney injury; however, he still suffered worsening kidney function that required the initiation of dialysis while suffering from a urinary tract infection, delirium, sepsis, septic shock, and multisystem organ failure. On March 27, 2015, Sherman Ward died after requiring intubation with a mechanical ventilation, vasopressor support, and continuous renal replacement therapy.

¶7. On May 4, 2016, Speights filed a wrongful death action for medical negligence against Dr. Williams arising out of the treatment administered at SMRMC. Speights alleges that Dr. Williams was negligent by ordering repeated contrast-enhanced CT scans despite

3

Ward showing signs of renal failure pursuant to the lab work ordered by Dr. Williams. Speights alleges that such breach in care resulted in Ward's contrast-induced nephropathy that ultimately led to his death.

¶8.    Speights first designated Dr. David Howes as an expert in the field of emergency medicine. However, Dr. Howes was unable to continue as an expert due to unforeseen personal circumstances. Speights then filed a motion to substitute the expert witness, which was granted on February 19, 2019. Dr. Howes was substituted by Dr. Steven Weisbord, a nephrologist who specializes in the care and treatment of kidneys. Notably, Dr. Howes and Dr. Weisbord had the same opinion as to the standard of care.

¶9.    Among other information, Dr. Weisbord's expert opinion stated, "[I]t is well recognized that the sequential administration of intravascular contrast over a short period of time in patients at elevated baseline risk significantly increases the likelihood of kidney damage from intravenous contrast. Documentation in the medical records from providers who cared for him in the hospital acknowledged that repeated contrast administrations were the cause of his acute kidney injury."

¶10.    A deposition of Dr. Weisbord was conducted in which he was questioned on whether he was an emergency room expert or an expert in the realm of nephrology:

> Q:    Have you ever practiced, Dr. Weisbord, in the field of emergency medicine?
>
> A:    I see patients in the emergency room not infrequently. During my fellowship, I did a fair amount of moonlighting in the emergency room during my internal medicine residency, but I don't do formal attending in an emergency room.

4

. . . .

Q: . . . Dr. Weisbord, are you holding yourself out in this case as an expert in the field of emergency medicine?

A: I'm not holding myself out as an expert in the field of emergency medicine. I'm holding myself out as an expert in the actions that were taken that relate to this patient's kidney disease and his acute kidney injury.

. . . .

Q: There's been a motion filed to exclude your opinion, to exclude the standard of care opinion that you've given. . . . In sum, Dr. Weisbord has not demonstrated any expertise and/or familiarity with the specialty of emergency medicine . . . How would you respond to that . . . ?

A: . . . I am very familiar with the standards regarding the administration of contrast to patients with kidney disease. I am familiar with the practice of emergency medicine, specifically related to the use of IV contrast in patients who are in the emergency room. I regularly see patients in the emergency room. I regularly opine as a consultant for patients in the emergency room regarding the administration of contrast and other things related to patients with kidney disease.

. . . .

Q: Doctor, let me just follow up on the questions about your experience in the ED.

A: . . . So while I don't have – have not completed a residency in emergency medicine, the administration of IV contrast in the setting of a CT scan is not a procedure exclusive to the emergency room or to emergency room physicians. It's a general procedure that can be ordered and is ordered by almost any physician or provider in the hospital with privileges to do that.

. . . .

So it is not a procedure or an issue that is exclusive to the emergency department, or that emergency department training specifically for that is exclusive to emergency room physicians.

5

¶11. Believing that Dr. Weisbord's deposition proved that he was not qualified to testify in the realm of emergency medicine, Dr. Williams moved for a motion to exclude Dr. Weisbord's standard-of-care opinion and a motion for summary judgment. After hearing the arguments of both parties, the circuit court granted the motion to exclude the standard-of-care opinions of Dr. Weisbord, finding that "Mississippi law requires a plaintiff to procure an expert familiar with the specialty of the defendant doctor, and Dr. Weisbord, a nephrologist, lacks the background, training, knowledge, or experience to know the standard of care applicable to an emergency medicine physician, such as Dr. Williams, in treating a patient such as Mr. Ward . . . ." Summary judgment was then granted due to the lack of an expert opinion needed to establish a standard of care for medical negligence. Speights now appeals, alleging that the circuit court erred when granting summary judgment.

## STANDARD OF REVIEW

¶12. "The standard of review for the admission or exclusion of expert testimony is abuse of discretion." *Patterson v. Tibbs*, 60 So. 3d 742, 748 (¶19) (Miss. 2011) (citing *Utz v. Running & Rolling Trucking Inc.*, 32 So. 3d 450, 457 (Miss. 2010)). "The appellate court should find error in the trial court's decision to exclude expert testimony only if the decision was arbitrary or clearly erroneous." *Id.* (citing *Franklin Corp. v. Tedford*, 18 So. 3d 215, 237 (Miss. 2009)).

¶13. Motions for summary judgment are governed by Mississippi Rule of Civil Procedure 56. "When reviewing a trial court's grant of summary judgment, [the] standard of review [on appeal] is de novo." *Webb v. Braswell*, 930 So. 2d 387, 395 (¶12) (Miss. 2006). "In

considering this issue, we must examine all the evidentiary matters before us, including, inter alia, admissions in pleadings, answers to interrogatories, depositions and affidavits." *Id*. "The movant carries the burden of demonstrating that no genuine issue of material fact exists, and the non-moving party is given the benefit of the doubt as to the existence of a material fact." *Id*. "We are to view the evidence in the light most favorable to the party opposing the motion." *Id*. "If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in that party's favor." *Id*.

¶14. The appellate court reviews "the trial court's decision to exclude the . . . experts' testimony for abuse of discretion[,] [b]ut [the appellate court] reviews the court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the party against whom the summary-judgment motion has been made." *Hyde v. Martin*, 264 So. 3d 730, 734 (¶14) (Miss. 2019) (citation omitted).

**DISCUSSION**

¶15. Speights argues that the circuit court erred by excluding Dr. Weisbord's testimony and granting summary judgment. We agree. "In regard to the admissibility of expert witness testimony, the trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable." *Yerks v. Trest*, 246 So. 3d 956, 959 (¶9) (Miss. Ct. App. 2018) (quoting *Barrow v. May*, 107 So. 3d 1029, 1035 (¶14) (Miss. Ct. App. 2012)). "Mississippi law requires the trial court to ensure that proposed testimony satisfies Rule 702 of the Mississippi Rules of Evidence." *Scafidi v. Hille*, 180 So. 3d 634, 659 (¶95) (Miss. 2015) (quoting *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (¶15) (Miss. 2007)). Rule

7

702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

M.R.E. 702.

¶16. The circuit court disregarded Dr. Weisbord's opinion under the impression that as a nephrologist, he lacks the background, training, knowledge, or experience to know the standard of care applicable to an emergency medicine physician, such as Dr. Williams. In granting the motion to exclude Dr. Weisbord's standard-of-care opinions, the court stated, "Mississippi law requires a plaintiff to procure an expert familiar with the specialty of the defendant doctor . . . ." However, our Supreme Court has stated, "Generally, it is not required that an expert in a medical-malpractice case be of the same specialty as the doctor about whom the expert is testifying." *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 181 (¶15) (Miss. 2009). "It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." *Id.* (quoting *West v. Sanders Clinic for Women P.A.*, 661 So. 2d 714, 719 (Miss. 1995)). "However, the expert still must show satisfactory familiarity with the specialty of the defendant doctor in order to testify as to the standard of care owed to the patient." *Id.*

8

¶17.    In *McDonald*, a board-certified pathologist and psychiatrist was not qualified to testify as an expert in a medical malpractice case against a gastroenterologist. *Id.* at 178 (¶¶5-7). In ruling on the motion, the trial court determined that the "plaintiffs have offered no evidence that . . . their experts have any familiarity with the standard of care applicable to [the] gastroenterologist." *Id*. at 181 (¶16). The pathologist had never practiced in the field of gastroenterology, and since medical school, he had only performed one colonoscopy. *Id*. Additionally, he had never performed an esophagogastroduodenoscopy, the procedure performed on the patient before his death. *Id*. at (¶18). The court further stated, "In order to testify, [the pathologist], while not required to be a gastroenterologist, had to at least be familiar with the standard of care to which a gastroenterologist is held." *Id*. at (¶17).

¶18.    Our case is distinguishable from *McDonald* because as a nephrologist Dr. Weisbord specializes in care of the kidneys, which is relevant in this case because Ward suffered from chronic kidney disease. Speights alleges that the negligent care of Dr. Williams led to worsening kidney function, which, in turn, led to his death. While his education and background preclude him from testifying to the standard of care for emergency medicine, it is still within his realm of expertise to discuss the standard of care surrounding CT scans in relation to kidneys.

¶19.    In *Partin v. North Mississippi Medical Center Inc.*, the expert witness for the estate of the deceased patient was qualified to testify to issues regarding the standard of care, breach, and causation relating to a hospital, particularly the hospital's nursing staff. *Partin v. N. Miss. Med. Ctr. Inc.*, 929 So. 2d 924, 930 (¶¶19-20) (Miss. Ct. App. 2005). Although

9

he was not, by specialty or title, a nurse or hospital administrator, he was a board-certified obstetrician/gynecologist (OB/GYN), practicing locally, had extensive experience working in a hospital setting, maintained hospital privileges at several hospitals, and was currently on staff at a local hospital; he also had very respectable academic history. *Id*. at 931 (¶23).

¶20. This very Court reasoned, "A witness 'qualified as an expert by knowledge, skill, experience, training, or education' may testify and offer opinions if his 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.' M.R.E. 702. However, this Court will limit an expert's testimony to matters within his demonstrated area of expertise." *Partin*, 929 So. 2d at 930 (¶21) (quoting *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 781 (¶52) (Miss. 2004)). Notably, Dr. Weisbord's proposed opinion remained within his realm of nephrology and did not assert any opinions as to the standard of care for emergency medicine. His knowledge concerning nephrology may assist the trier of fact with understanding central issues of this case concerning kidney care.

¶21. *Partin* further asserts that "[t]he test is whether a witness 'possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman.'" *Id*. (quoting *Nunnally v. R.J. Reynolds Tobacco Co.*, 869 So. 2d 373, 384 (¶36) (Miss. 2004)). "Thus, as long as the witness possesses . . . that 'peculiar knowledge not likely to be possessed by a layman,' the witness may be qualified to testify as an expert in those different areas." *Id*. It is not likely that a layman possesses knowledge regarding kidney dysfunctions and CT scans; thus Dr. Weisbord's testimony would aid the

trier of fact in making a determination. More specifically, Dr. Weisbord has attested to conducting research on kidneys and the negative impact CT scans may have on them.

¶22. Additionally, our Supreme Court has held that a physician who is sufficiently "familiar with the standards of a medical specialty, may testify as an expert, even though he does not practice the specialty himself." *Cheeks v. Bio-Med. Apps. Inc.*, 908 So. 2d 117, 120 (¶18) (Miss. 2005); *see also Sacks v. Necaise*, 991 So. 2d 615, 622 (¶23) (Miss. Ct. App. 2007).

¶23. In *Sacks*, the expert nurse in question was allowed to testify as to her knowledge in chemotherapy although she had not been a practicing nurse in twenty years and was not a certified chemotherapy nurse. *Sacks*, 991 So. 2d at 622 (¶23). This Court reasoned that during her career, she saw infiltrations and extravasations, which qualified her to testify about whether chemotherapy drugs were properly administered. *Id.* Additionally, she was familiar with the current standard of chemotherapy administration. *Id.* Comparatively, Dr. Weisbord, as a part of his practice, asserts that he often consults with emergency room physicians regarding CT scans and kidney care, showing his familiarity with the administration of CT scans in an emergency-department setting.

¶24. Dr. Williams argues that Dr. Weisbord's testimony should not be heard because he is not an emergency-medicine physician, has not completed residency training in emergency medicine, and only "moonlighted" in an emergency department during a fellowship; thus he lacks the background, training, and experience needed to qualify as an expert. However, this argument neglects much of this State's caselaw, and we find Dr. Weisbord's testimony is

11

applicable to the case at hand since he specializes in the care and treatment of kidneys, which is the central issue of this case. As a kidney specialist, he is sufficiently familiar with the practice of emergency medicine to testify regarding CT scans in relation to his speciality, nephrology.

¶25.    In *West*, *supra*, our state Supreme Court answered whether an expert witness who is a specialist in a particular area of medicine can testify about the standard of care regarding a procedure which could be performed by a general practitioner. *West*, 661 So. 2d at 716. The Court stated, "A specialist may testify as to the standard of care that a general medical practitioner should follow when performing a recognized medical procedure." *Id.* at 720. Further articulating this notion, the Court clarified that "any licensed practitioner could testify that the defendants violated the standard of care, not as specialists, but as general practitioners . . . .  As we pointed out in *Brown v. Mladineo*, 'it was not our intent to adopt a uniquely restrictive standard by holding that only a specialist can testify about the standards of his own specialty.'" *Id.* at 719 (quoting *Brown v. Mladineo*, 504 So. 2d 1201, 1203 (Miss. 1987)). Likewise, the Court "did not intend to restrict a specialist from offering his opinion as to what standards a general practitioner should adhere to." *Id*.

¶26.    Dr. Weisbord stated that "the administration of IV contrast in the setting of a CT scan is not a procedure exclusive to the emergency room or to emergency room physicians. It's a general procedure that can be ordered and is ordered by almost any physician or provider in the hospital with privileges to do that." We agree. Therefore, as a kidney specialist, he is still qualified to testify about the standards of his own specialty and the standard of care that

12

a general practitioner should follow when performing a recognized medical procedure such as CT scans with intravenous contrast.

¶27.    Thus, the circuit court incorrectly determined that the expert witness must practice the same medical specialty as the defendant doctor. The circuit court narrowly interpreted the state's caselaw; however, as we articulated in *Partin*, "[i]t was not our intent to adopt a uniquely restrictive standard by holding that only a specialist can testify about the standards of his own specialty." *Partin*, 929 So. 2d at 931 (¶22). Therefore, we reverse and remand this case for further proceedings that allow Dr. Weisbord to testify as an expert witness.

¶28.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY,  SMITH AND EMFINGER, JJ., CONCUR.**